LYON NON–SKID CO. et al. v. EDWARD V. HARTFORD, Inc.

(District Court, S. D. New York. November 15, 1917.)

No. 152.

1. PATENTS ⬦328—VALIDITY—INFRINGEMENT.

The Lyon patent, No. 1,198,246, for an automobile bumper, consisting of two integral spring steel strips having considerably greater vertical width than thickness to render them relatively rigid while resiliently yielding in horizontal directions, held valid and infringed by defendant's device.

2. PATENTS ⬦328—VALIDITY—ANTICIPATION.

The Lyon patent, No. 1,198,246, for an automobile bumper, held valid, and not anticipated either by the prior art or previous patents for various styles of bumpers.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3.** PATENTS �köö26(2)—VALIDITY—INVENTION.

If a new combination and arrangement of known elements produce a new and beneficial result never obtained before, it is evidence of invention.

**4.** PATENTS �köö165—CLAIMS—CONSTRUCTION.

Since all claims in a patent must be given as broad a scope as their language will bear, no court is justified in reading into a claim limitations not set forth to establish the invalidating force of a prior construction.

**5.** PATENTS �köö328—VALIDITY—INFRINGEMENT.

The amended claims in the Fageol patent, No. 1,202,690, for an automobile bumper, *held* not infringed by the Lyon patent, No. 1,198,246, for such a bumper, for there can be no revamping of an abandoned or unsuccessful construction or patent application so as to invalidate a patent for a successful device.

**6.** PATENTS �köö168(2)—CLAIMS—AMENDMENT.

Effect will not be given amendments filed in a patent application, in an effort to secure claims broad enough to affect a patent for a device already made public, but for which patent had not then been issued.

In Equity. Suit by the Lyon Non-Skid Company and the Metal Stamping Company against Edward V. Hartford, Incorporated, which filed a cross-bill. Decree for complainants for injunction and reference.

Harry L. Duncan, of New York City (Drury Cooper, of New York City, of counsel), for plaintiffs.

Clifford E. Dunn, of New York City, for defendant.

MANTON, District Judge. The complainants sue for infringement of patent, claiming that the defendant, in the manufacture of its automobile bumper, has infringed their patent No. 1,198,246, granted September 12, 1916. It will be referred to hereafter as the Lyon bumper.

There is a cross-action by the defendant claiming infringement by the plaintiffs of the Fageol patent No. 1,202,690, granted October 24, 1916. The complainants rely upon claims 3, 4, 5, 7, 8, 10, 15, and 18. The Metal Stamping Company is the licensee under an agreement dated February 25, 1915, manufacturing the Lyon patent, which patent was granted to the complainant, the Lyon Non-Skid Company. The defendant is a licensee of the Fageol patent dated September 3, 1912, and claims infringement of claims 8, 12, 17, and 19. The subject of making a useful commercial automobile bumper has received considerable effort by inventors, as appears by the prior art. Considerable evidence, as well as copies of prior inventions showing the state of the prior art, have been received in evidence, and will be referred to later. The general type of bumper which is being manufactured under the Lyon patent by the plaintiff and the defendant indicates a useful invention, unusual in a number of respects, but serviceable and commercially profitable. The Lyon all-spring bumper is formed of flat spring strips so as to be adjustable in width and fit any make of car. Its metal is so constructed and so shaped that it will stand bumping, and its action in resiliency will stop an automobile going at 10 to 15 miles an hour, causing a rebound without damage to the bumper or the car itself, as

the evidence disclosed occurred on a number of occasions. Indeed, the evidence indicates that the bumper itself would spring back to its original shape with little or no damage to it. This, compared with the practical experiments of the behavior of prior commercial bumpers, is ample evidence of the claim made for it, not only of improvement in the art, but of substantial invention. The experiments with prior commercial bumpers, such as the one made of channel bar or rigid round bar type, resulted in the bar breaking and destroying or seriously damaging the part of the car which came in collision with the striking part. The result of this action of the Lyon bumper, as manufactured by the Metal Stamping Company, opened a profitable commercial field. Its usefulness is indicated by the extent of its sales, for it is now said that the stamping company has an output of about 800 bumpers a day. In shape and contour, in the kind of metal used, in operation and efficiency, the Lyon and the Hartford bumpers are practically identical. They have both been favored by a well-patronizing public, and both have met with general success. Each now claims appropriation by the other, and the question for decision is which is right in its contention.

Considering the prior art, from the patents in suit, it appears that Simms was the pioneer in the bumper art. His application, filed September 26, 1905, disclosed a structure consisting of pneumatic buffer bars placed in front of the vehicle and connected thereto by spring supporting members formed of flat stock set edgewise. Harroun filed his application on March 29, 1906, showing a tubular bumper bar connected to the vehicle by sliding rods or members, springs being provided to afford yielding resistance to the shocks sustained. February 21, 1908, Sager applied for a patent upon his bumper construction, which showed a tubular bar mounted to yield against spring tension, but different from the Harroun, in that the supporting members for the bar were pivotally connected to the car. He, too, used coiled springs to take up the shock. These bumpers, while affording some spring movement, were greatly limited in their utility, and were not successful. The result of these efforts, and the efforts of others referred to hereafter, did not bring bumpers upon automobiles into considerable use. To be sure, other reasons have been ascribed for failure to use, such as the condition of the congestion of traffic and want of education of the public in the usefulness of bumpers, but the best reason for the inconsiderable use of bumpers was the failure to have an adjustable bumper, resilient in its action, which would accomplish the work of bumping successfully.

In these round bar or channel bar bumpers, as was exemplified by the type referred to, the bumper was extended across the front of the automobile, was relatively rigid, and was mounted on comparatively weak springs, resulting in a yielding to a limited extent only. This was insufficient to absorb a moderate collision impact, with the result that the bumper bar was easily broken or seriously distorted, with consequential damage to the colliding part of the automobile. Oftentimes the bar would break and go through the automobile radiator, resulting in damage or destruction to this delicate construction. And in the case of rigid bar bumpers, they too were unsatisfactory to the trade, for

riding on the automobile in rigid position resulted in a series of shocks, which ultimately caused loosening up and rattling as a result of this severe jolting.

These results indicated a failure to solve the bumper problem, for they failed to meet the requirements of a successful automobile bumper, namely, to absorb, without injury, the force of substantial collision impact. To accomplish this result, it became necessary to find a bumper which would be so constructed, in shape and material, as not to be permanently deformed or distorted by the blow, so that, if bent, it would return to its original condition, and be so resilient as to yield gradually over some considerable space whatever resistance it might meet when struck. So, also, the successful automobile bumper must be free from the objectionable and fatal vibration in loosening action, as became so pronounced in the bumpers tried out theretofore. The development of the bumpers involved in this action seems to have met with these requirements, and, therefore, with success. Another important consideration, for the success of a bumper, was to have one adjustable to all sizes of cars without sacrificing the other characteristics mentioned, and this, because the jobbers and auto supply houses need not keep a great variety of sizes of bumpers to fit the various makes of automobiles.

[1] The Lyon claims 3, 4, 5, 7, 8, 10, 15, and 18 are as follows:

"3. The automobile buffer consisting of two integral spring steel strips having considerably greater vertical width than thickness to render them relatively rigid vertically while resiliently yielding in horizontal directions, each of said strips having a rearwardly extending attaching member to be attached to the automobile, and having a transversely extending impact receiving member and an intermediate curved resilient member, the impact receiving members of said strips overlapping to stiffen and strengthen this part of the buffer, and means adjustably connecting said impact receiving members and holding them against relative vertical movement and providing for the lateral adjustment of said strips so as to adapt the buffer for attachment to automobiles having supporting members located at different distances apart.

"4. The automobile buffer consisting of two similar integral spring steel strips having many times greater vertical width than thickness to render them relatively rigid vertically while resiliently yielding in horizontal directions, each of said strips having an inwardly and rearwardly extending attaching member to be attached to the side members of the frame of the automobile, and having a transversely extending impact receiving member and an intermediate rearwardly curved loop formed with an open inner end and extending into protective position adjacent the automobile wheel, and connecting means adjustably connecting said impact receiving members and holding them against relative vertical movement and forming overlapping members to stiffen and strengthen this part of the buffer and providing for the lateral adjustment of said strips so as to adapt the buffer for attachment to automobiles having side frame members located at different distances apart.

"5. The automobile buffer consisting of two integral spring steel strips having greater vertical width than thickness to render them relatively rigid vertically while resiliently yielding in horizontal directions, each of said strips having an attaching member to be attached to the automobile, and having a transversely extending impact receiving member and an intermediate loop, and connecting means adjustably connecting said impact receiving members and holding them against relative vertical movement and forming overlapping members to stiffen and strengthen this part of the buffer and pro-

viding for the lateral adjustment of said strips so as to adapt the buffer for attachment to automobiles having supporting members located at different distances apart."

"7. The automobile buffer comprising horizontally yielding and relatively vertically rigid elements having transversely extending impact receiving members and having attaching members to be attached to the vehicle, and adjustable connecting means connecting said impact receiving members and holding them against relative vertical movement and forming overlapping reinforcing members in the impact receiving portion of the buffer, said connecting means providing for the lateral adjustment of said buffer to adapt it for attachment to parts of vehicles located at different distances apart.

"8. The automobile buffer comprising horizontally yielding and substantially vertically rigid elements including a pair of transversely extending impact receiving members, curved resilient members comprising open-ended lateral loops and attaching members to be attached to the vehicle, connecting means connecting said impact receiving members and holding them against substantial relative vertical movement and forming in connection therewith overlapping reinforcing members in the front portion of the buffer, and means providing for the lateral adjustment of said attaching members to adapt them for attachment to parts of vehicles located at different distances apart."

"10. The vehicle buffer comprising vertically rigid lateral spring members having longitudinally extending attaching members to be attached to supporting members of the vehicle and having a transverse member secured to another transversely extending spring member of the buffer so as to be laterally adjustable with respect thereto and adapt the buffer to vehicles having supporting members located at different distances apart."

"15. The vehicle buffer comprising open-ended loops extending outwardly at the transverse ends of the buffer and connecting means at the front of the buffer to space said loops apart, said loops and connecting means being vertically rigid but horizontally yieldable and rearwardly extending attaching means on each side of the buffer and integral with the corresponding loop to mount said buffer on the vehicle frame and relatively adjustable to fit the side members of vehicle frames which are at different distances apart."

"18. The automobile buffer comprising open-ended loops extending outwardly at the transverse ends of the buffer and an impact receiving portion forming a continuation of said loops and spacing them apart, said loops and impact receiving portion being vertically rigid but horizontally yieldable and rearwardly extending attaching means to mount said buffer on the vehicle frame and relatively adjustable to fit the supporting members of the vehicle which are at different distances apart."

Fageol filed his application June 6, 1910; his patent was granted October 24, 1916. In August and September, 1916, the following amendments were filed:

"My invention further contemplates the provision of a bumper for motor vehicles and the like of such nature as to be particularly effective in deflecting the shocks from encountering obstacles in such a way as to minimize the danger of injury either to the vehicle or to the object encountered.

"A further object of my invention is the provision of a bumper which will yield in all directions both forward and back and laterally, and more particularly in which the end portions of the bumper will yield to a considerable extent, whereby the force of impact or blow received from the bumper from any angle, and particularly upon the end portions thereof which are exposed and most likely to be struck, will be dissipated through the resiliency of the bumper, and the car, as well as any object struck, most effectively protected against injury.

"Another object of the invention consists in the provision of a bumper structure of such character that the bumper itself will not be destroyed or permanently distorted or injured by the less important shocks to which a

bumper is frequently subjected, so that the bumper will not be quickly rendered useless or distorted into unsightly form.

"A further object of the invention is the construction of a bumper in such a way that it may be adjusted to render it capable of being attached to cars of various types and sizes and having different widths of frame.

"Another object of the invention is the provision of a bumper structure which will be attractive in appearance, as well as efficient and durable, and which shall tend to improve the appearance of the vehicle to which it is applied. * * * The latter result is promoted particularly by the rearward curvature of the end portions of the bumper, which are also yielding, so that if the bumper receives an impact at one side of the center thereof that side of the bumper will yield, and that the inclination thus produced in addition to the initial end curvature will guide the object laterally and rearwardly out of the path of travel of the car. This result is further promoted by forming the bumper ends of smooth metal spring bars which cause the blows to glance off. in a manner which would not be so satisfactorily obtained if the front of the bumper were, for instance, formed of rubber tubing or the like.

" * * * Furthermore, owing to the yielding character of the bumper and particularly the end portions thereof, it will be seen that when the bumper is subjected to even considerable shocks, it will yield without being broken or permanently damaged. The end portions of the bumper are particularly likely to be struck glancing or other blows, and these portions, being of spring material, will at once return to their original shape without any permanent injury being caused to the bumper whatever.

"It will be seen that the bumper described includes an impact receiving member comprising the body portion 1 of the bumper and the outward extending sections of the spring end portions of the spring support 2 and 2', which comprise in fact extensions of the body 1, and that this impact receiving member is formed, as to its end portions at least, of spring metal; that is, metal which will yield to a substantial extent and return to its original shape. The end portions of this impact receiving member are also reinforced and yieldingly supported by the inwardly bent parts of the spring supporting members, which assist in restoring the bumper to its original position after impact. The use of spring material in the construction of the bumper itself is of particular importance in securing durability and ability to withstand impacts without permanent distortion, thereby overcoming a defect to which bumpers made of rigid material have been peculiarly subjected."

It is claimed by the complainant that these amendments were proposed, as part of the plan of adoption of the Lyon bumper, and that these claims were improperly broadened and specifically revamped to secure pretended control of the Lyon bumper. I shall refer to this claim again.

The Lyon bumper proved to be the first successful bumper. It met the requirements and conditions of an automobile collision bumper. Its success in the market and acceptance by the trade, by very extensive use and sale, is ample proof of its distinctive novelty. The flat spring strips form loops at the sides of the automobile, and then extend backward so as to form attaching members, which in the regular bumper are clamped to the goose necks or frame members of the automobile. An examination of the way the bumper is attached to the automobile and its resilient yielding action indicates its appropriateness for discharging the functions required of a successful bumper. The striking difference between the vertical and horizontal rigidity of the Lyon bumper is secured by the use of flat spring strips having

many times greater vertical width than thickness. The commercial bumpers are made with spring strips whose width is about 6 times their thickness, giving 36 times the vertical rigidity or resistance to bending as compared to their horizontal stiffness, using the same forces. This has resulted, as experience taught, in preventing all vertical vibration under running conditions and correspondingly minimizing loosening or other undesirable action due to successive shocks, so that the bumper does not vibrate or strain itself or work loose before it is called for use in collision action. A collision impact on the central part first causes the same resilient end loops to close together, and at the same time the central spring part bends, and when the end loops are each brought together so that flat surface came into secure supporting contact, the double spring central portion continues to yield until the collision impact is absorbed in this way. The spring elements of the bumper then tend to restore themselves, and the force they exert against the colliding object forces the car backward through a space corresponding to the force of the collision. The all-spring construction of this bumper contributes to its very effective collision operation, since all parts of the bumper have a resilient yielding action under impact, for the connecting means or clamping device used to adjustably connect the spring strips together do not interfere with their resilient action under collision conditions. Since it is all spring in its action, it matters not what part of the bumper is struck. All the spring action of the bumper is brought into operation and operates in some degree in like manner. The clips or clamping devices are adjustably connected, the front spring strips or impact receiving members permit of an adjustment in width, so as to fit automobiles having frame members located at different distances apart, and also at the same time provide for a double or reinforced impact receiving member throughout the central part of the bumper, where the bending strains are greatest, and where the greatest damage would be caused if the bumper yielded so as to allow injury to the automobile. The two pieces of spring steel are the same in size and contour, so that the manufacturing problem is thus reduced.

The witnesses on both sides agree that this type of automobile bumper has solved the problem of manufacturing a successful automobile bumper.

The defendant's bumper comprises two flat spring strips, having rearwardly extending ends or attaching members to be clamped to the automobile and curving outward to form end loops in front of the automobile wheels, as in the Lyon bumper. The two inner ends of these spring strips are adjustably connected, by a connecting or coupling device, which comprises one or more splice bars or spring strips secured to the main spring members, and which re-enforce the front of the bumper at its impact receiving portion. The clamping device used comprises two clamps or screw clips engaging the spring members on either side of the center at a distance of about 10 inches apart, comprising a channel frame which serves to hold these two connecting clips apart.

While this Hartford clamping device is different in detail from the two disconnected clamping devices or clips used in the Lyon, which are supported at a greater distance in that spring bumper, yet the action of the Hartford clamping device is identical with that of the Lyon in adjustably connecting the two main spring members having the side loops and forming a re-enforced central impact receiving member for the bumper, and also in allowing the free resilient movement of all the spring members within the channel member of this Hartford clamping device. This double Hartford clamp prevents any of these parts getting out of vertical alignment. The spring strips have the same proportion vertical width to thickness, at about a 6 to 1 ratio, as in the Lyon bumper.

As in the Lyon bumper, this gives a very much greater vertical rigidity than the horizontal yielding action of the device. Therefore, it serves to prevent undesirable vibration and consequential likelihood of breaking. Under collision conditions, the Hartford bumper has the same resilient action as the Lyon did to this spring construction. Indeed, the equivalents, in action and character, between the Hartford and Lyon bumpers are generally recognized throughout the trade, and is so claimed by the defendant in marketing its goods. The record shows an easy substitution of the Hartford bumper where the Lyon spring bumper was asked for.

It is claimed by the defendant that the rigid connection of the clamping device tightly engages the spring members, and to some extent prevents their resilient action, at least to the extent of rendering ineffective the 8 or 10 inches of spring bar within the clamp, but this would do no more than render the Hartford bumper less effective in its resilient action, and since the resilient action in that 8 or 10 inches would be but a small part of the 110 inches, the full length of the spring, it would be relatively negligible. This would not relieve the defendant from the claim of infringement. Beyond this, this clamping device does not render the portion of the spring bars within the clamp resilient.

Lyon, in his claims as to construction, provides for two integral steel strips having greater vertical width and thickness to render them relatively rigid vertically, while resiliently yielding in horizontal directions, each of said strips having a vertical member to be attached to the automobile and having a transversely extending impact receiving member and an intermediate loop and connecting means adjustably connecting the said impact receiving members, and holding them against relative vertical movement and forming overlapping members to stiffen and strengthen this part of the bumper and provide for the lateral adjustment of said strips so as to adapt the bumper for attachment to automobiles having supporting members located at different distances apart. The Hartford bumper in its construction has all of these parts. It has the two spring strips with the attaching member extending rearward to be attached to the automobile; the two strips have a transversely impact receiving member, where the strips extend inward along the front of the bumper. It has an intermediate loop in

these spring strips which is the lateral loop extending in front of the wheels as in the Lyon bumper. It has the connecting means adjusta-bly connecting the impact receiving members and holding them against relative vertical movement. Since its clamping device has the same arrangement and function, it embodies this element or feature of the Lyon claim.

The clamping means of the Hartford bumper forms overlapping members to stiffen or strengthen this front part of the bumper, and also provides for the lateral adjustment of the spring strips so as to adapt the bumper for attachment to automobiles having supporting members different distances apart.

Similarly examining all the Lyon claims, it will be found that the Hartford bumper infringes. The difference, if any, is found in the clamping device, but I am satisfied that that is a clear and absolute equivalent of the function and operation of the Lyon clamp. There-fore this successful spring bumper, after it has come into extended use throughout the trade, has been adopted, under circumstances herein stated, by the defendant and appropriated by it. There was evidence in the record which would indicate that plaintiffs' workmen were taken over to defendant's plant and put to work and its manufacturing meth-ods copied.

[2] Nor do I think that there is any force in the claim of anticipa-tion as urged against the Lyon bumper. The Harroun and Sager pat-ents for bumper bars have been referred to heretofore.

The Conover patent, No. 1,000,668, of August 15, 1911, relates to the channel bar bumper consisting of a rigid channel iron extending across the frame of the automobile and mounted as the round bar rigid bump-ers.

The Welton patent, No. 955,624, of April 19, 1910, is but another variation of the rigid round bar bumper construction of the prior art.

The Newcomb patent, No. 969,143, of August 30, 1910, is a trolley car fender. It comprises a series of spring bars extending in front of the trolley car and having special spring supports pivoted thereto to give increased resilience as desired.

The Fulton patent, No. 556,410, of March 17, 1896, is not intended for and could not operate as a bumper for vehicles. It shows a spring strip bumper having looped ends.

The Allez, No. 428,575, of July 30, 1909, shows the general looped or end contour of the Lyon bumper used as the front or actuating member of a street car fender. It is pivotally mounted on a crank shaft so as to have the resilient yield in a rearward direction when struck. It has no other structural features or functions which make the Lyon device practical and useful.

The Conway patent, No. 683,329, of February 11, 1912, is another buffer used on a trolley car, comprised of a curved front bar or feeler bar yieldingly supported in the front of the device by a pair of slide rods.

The Hoover shows this general looped end form of bumper of one single strip. It was granted after the Lyon patent, and the Lyon dates of invention are carried back of the Hoover application date.

Lyon, during the spring of 1911, made and tested a one-piece type of bumper and also two types of two-piece bumpers such as are illustrated in the patent in suit. Lyon disclosed his bumper in January, 1911, at the New York Auto Show, and within a few days thereafter returned to Philadelphia and proceeded to design and make a number of types of spring bumpers. In January or February, 1911, he made a looped end two-piece spring bumper of the contour shown in the exhibits offered as the bumper made patented after the one in suit. These bumpers were tested and used on automobiles in the early part of 1911. They were then made in a commercial way in the middle of 1911 and up to the first of 1912. The last half of 1914, Lyon negotiated with the Metal Stamping Company, and it resulted in the contract of February 25, 1915, under which the Lyon spring bumpers are now being manufactured by this latter company as the licensee. Lyon explains his failure to push the bumper more actively because of his inability to finance it.

The Lane bumper was made and sold in 1906 and 1907 and advertised in publications in March, 1908. It was made in Poughkeepsie, N. Y., and it is claimed by the plaintiff that it anticipated the Fageol bumper.

The Fageol bumper consisted of an impact receiving member which in construction was rigid. It was constructed in part of spring material, the spring material being disposed at the end of the bumper, where it was bent backward and inward, so as to extend for a substantial distance, parallel with the impact receiving portion and then backward at right angles to serve as a means for connecting the whole structure to the automobile. The ends of these spring members constitute the sole means of support for the entire bumper. It had the range of elasticity as afforded by this structure, no matter where the impact was received. Both end springs co-operate to resist the impact wherever received. But, it is a rigid bar type of bumper in which a round rigid bumper bar is used, extending across the entire distance between the automobile frames. This was a decided reversion from the Lane bumper. It is claimed that the end loops, because they were necessarily made of round stock to secure the adjustable connection with the bumper bar, vibrated freely in response to the successive vertical shocks under running conditions of the automobile, with a consequential breaking. This bumper was not successful. Fageol turned out about 200 in California during the first half of 1910; about 17 or 18 were sold as bumpers and the balance as junk. It did not serve the requirements of an automobile bumper. This, together with the experiments in California, demonstrate that the Fageol bumper was a failure commercially, as well as practically. It was tried by the Accessories Manufacturing Company, who advertised it in the fall of 1910, but never sold any substantial number of them, and the balance of those, which were made up in New York, were sold to a junkman in Brooklyn. Thereafter Fageol made a cement bar bumper, but this was not a commercial success, nor did it give the necessary resiliency required of a bumper. In the experiments made with the Fageol bumper and the effort to make it a commercial success, there was lost

$5,000. The Fageol patented bumper is radically different in construction from the Lyon spring flat strip bumper. It has not been successful, as has been the Lyon bumper. The idea as to shape, configuration, or contour may be similar, but that is not enough to urge at this time when the Lyon bumper has succeeded.

[3] If a new combination and arrangement of known elements produces a new and beneficial result never attained before, it is evidence of invention.

The language used in the case of St. Louis Street F. Mach. Co. v. American Street F. Mach. Co., 156 Fed. 574, 577 (84 C. C. A. 340), is appropriate in the present case, where it is said:

"The new and beneficial result accomplished by the device of the patent already referred to consisting of the more effective and less injurious way of scouring and flushing streets might afford a sufficient answer to this first contention; but there is more. The defendant company as found by the learned trial court and shown by abundant proof, upon being advised of the features of the Ottofy invention, abandoned its old machine made according to the Murphy patent hereafter to be considered, and adopted the device of the Ottofy patent. Murphy, defendant's patentee, upon being advised of the defects in his machine, and the objections made to it which Ottofy later remedied, confessed his inability to obviate them. Pickles, the engineer of defendant company, upon hearing of Ottofy's invention, claimed to be the first and original inventor thereof, applied for a patent therefor, and assigned all rights to defendant. These are all significant admissions by experts, and that, too, against interest, of patentable novelty in complainant's device. There is also evidence of more or less cogency that that device has superseded other devices in the few cities which employ scouring and flushing machines in use upon smooth or asphalt streets. These facts are entitled to weight when the question is whether the machine exhibits patentable invention. Keystone Mfg. Co. v. Adams, 151 U. S. 139, 143, 14 Sup. Ct. 295, 38 L. Ed. 103; National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., 45 C. C. A. 544, 548, 106 Fed. 693, 707; Kinloch Tel. Co. v. Western Electric Co., 51 C. C. A. 362, 113 Fed. 652; Id., 51 C. C. A. 369, 113 Fed. 659, 665. In Krementz v. S. Cottle Co., 148 U. S. 556, 560, 13 Sup. Ct. 719, 720, 37 L. Ed. 558, Mr. Justice Shiras, in delivering the opinion of the court, after referring to the contention that the step taken by the patentee was one obvious to any skilled mechanic, says the contention is negatived by the conduct of defendant's president, which was in many respects like that of Murphy and Pickles. His language is: 'The view of the court below that Krementz's step in the art was one obvious to any skilled mechanic is negatived by the conduct of Cottle, the president of defendant company. He was himself a patentee under letters granted April 16, 1878, for an improvement in the construction of collar and sleeve buttons, and put in evidence in this case. * * * His improvement was to form a button of two pieces, the post and base forming one piece and then soldering to the post the head of the button as the other piece. Yet skilled as he was, and with his attention specially turned to the subject, he failed to see, what Krementz afterwards saw, that a button might be made of one continuous sheet of metal, wholly dispensing with solder, of an improved shape, of increased strength, and requiring less material.' "

[4, 5] The assignment of the Fageol patent is no protection to the defendant. After its purchase, the defendant continued to make Fageol's cement bar bumper and his channel bar bumper from 1912 to 1916. The defendant knew of the Lyon spring bumper on January 11, 1915. Thereafter the superintendent and foreman of the Metal Stamping Company was employed by the Hartford Company. Ar-

thur Mayer, a former employé of the Metal Stamping Company, is not only in charge of the sale of the Hartford bumper, but is also in receipt of a royalty on all the bumpers made, and, indeed, it would appear that Mayer brought the idea of constructing this bumper to the Hartford Company.

The defendant, by trade notices sent out, would have the public believe that Edward V. Hartford was the originator of the idea found in the Hartford bumper.

The difference in construction, as heretofore pointed out, between the Lyon bumper and the Fageol patented bumper of the rigid bar type, make it impossible for any Fageol claims to approach the Lyon construction. At best, such claims are so broad as to be clearly anticipated by the Lane, Conway, and Fulton bumpers. Under the authorities, there can be no such revamping of an abandoned or unsuccessful construction or the patent application save only for the purposes of successful attack or pretended defense against the successful invention, like the Lyon bumper. Westinghouse v. N. Y. Air Brake Co. (C. C.) 87 Fed. 882; Diamond Co. v. Consolidated Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527.

Fageol's claims in suit may be considered as relating to a device in which the end loops or members are rigidly or permanently secured to the bumper bar or body member of the device. That is, none of the general features or details of the Fageol adjustable connection of the end loops with the tubular bumper bar have any proper importance or effect in interpreting the claims in suit. Since all claims must, according to the accepted rules of patent interpretation, be given as broad a scope as their language will bear, no court is justified in reading into a claim limitations not set forth to establish the invalidating force of a prior construction. Westinghouse v. Boyden, 170 U. S. 737, 18 Sup. Ct. 707, 42 L. Ed. 1136; McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800.

These radical differences in construction, co-operation of parts, and action under running conditions and collision conditions, not only make the difference between the commercial failure of the Fageol three-piece bumper and the success and extensive use and sale of the Lyon bumper, but they also mean a difference in type. Instead of the rigid bar Fageol bumper, Lyon developed an all-spring bumper which was so thoroughly successful that the Hartford Company, instead of trying to make further attempts to improve on the Fageol type, abandoned it completely, and appropriated the Lyon all-spring type of bumper with such relatively insignificant modifications as are present and referred to heretofore in the Hartford all-spring bumper against the manufacture and sale of which this suit is brought. Therefore I conclude the Fageol claims in suit are not infringed as claimed by the Hartford Company. It was held in Consolidated Valve Co. v. Crosby, 113 U. S. 157, 5 Sup. Ct. 513, 28 L. Ed. 939, that a failure in the prior art cannot, by modification, be made to stand as an anticipation of a successful invention.

[6] A series of amendments were filed within a month in the Fageol application before the Lyon patent was issued, in an effort to secure claims broad enough to affect the Lyon patent, and in this way many, if not all, the claims in suit were inserted and radically modified. This may have been brought about by the successful and extensive use of the Lyon bumper. The court should not lend its aid to such an effort of an enterprising patentee. Lovell v. Oriental Co., 231 Fed. 719, 146 C. C. A. 3.

The Lyon construction and operation was new in Lyon's work in 1911, and is covered by his patent in suit. Lyon gave his valuable invention to the public. Fageol gave a different type of rigid bar bumper which proved to be impracticable and a failure commercially. It inevitably follows that Lyon should have full credit for the success and the protection of the court.

For these reasons, a decree of injunction and reference will be granted.