GENERAL KNIT FABRIC CO. et al. v. STEBER MACH. CO. et al.

(Circuit Court of Appeals, Second Circuit.   January 16, 1912.)

No. 126.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—KNITTED FABRIC.
      The Scott patent, No. 899,439, claims 2 and 4, for a knitted fabric
   and method of producing the same, discloses patentable novelty and in-
   vention; also *held* infringed.
2. PATENTS (§ 53*)—ANTICIPATION—FABRIC.
      Anticipation of a patent for a new and useful fabric is not shown by
   evidence that prior to its invention a machine was in existence which by
   a few changes in adjustment was capable of producing the fabric.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 71; Dec. Dig.
   § 53.*]
3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—KNITTING MACHINE.
      The Scott patent, No. 925,393, for a knitting machine for producing a
   ribbed fabric, *held* not infringed, if conceded invention.

Appeal from the Circuit Court of the United States for the North-
ern District of New York.

Suit in equity by the General Knit Fabric Company, Robert W.
Scott, and L. N. D. Williams against the Steber Machine Com-
pany and Bernard T. Steber.   Decree for complainants, and defend-
ants appeal.   Reversed in part.

See, also, 190 Fed. 47.

Edgar M. Kitchin and Lewis, Watkins & Titus, for appellants.
Charles Neave and Howson & Howson, for appellees.

Before LACOMBE, COXE, and WARD, Circuit Judges.

COXE, Circuit Judge.   [1] The two patents in controversy cover,
respectively, a fabric and a machine for making the fabric.   The
fabric patent was granted September 22, 1908, upon an application
filed July 7, 1908.   The patentee says in the specification:

   "The object of my invention is to provide a ribbed fabric of uniform char-
acter and possessing the quality of elasticity characteristic of a ribbed fabric
but having a closer disposition of the wales and a heavier or firmer texture
than a ribbed knitted fabric produced in the usual way, my invention also
providing a ready means for producing vertical stripes or other ornamental
effects in the web."

The drawings contain three figures, which show in 1 and 3, re-
spectively, a face view, without and with a welt formation thereon,
and in figure 2 a sectional piece of the fabric, all on an exaggerated
scale.   Figure 4 is a diagrammatic representation of the needles of
a circular knitting machine adapted for the production of the patented
fabric.   The claims involved are as follows:

   "2. A knitted fabric comprising two ribbed webs with crossed sinker wales,
the ribs of one web being disposed in the spaces between the ribs of the
other web."
   "4. The mode herein described of producing a knitted fabric, said mode
consisting in feeding one yarn to one set of needles drawing stitches first in
one direction and then in the opposite direction, to produce a ribbed web,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and feeding another yarn to an alternating set of needles likewise drawing stitches first in one direction and then in the other direction and between the stitches drawn by the needles of the first set."

The defenses are want of novelty and invention and non-infringement. The refusal of the court to sustain these defenses is assigned as error.

We agree with the judge of the Circuit Court in thinking that no useful purpose will be accomplished by an attempt to describe in detail the fabric in question or the method of its production. To do this intelligently, without the use of diagrams and models, would be difficult, if not impossible. Those skilled in the art will understand our conclusions without such an attempt and they are probably the only persons who will be sufficiently interested to read what is said.

The fabric consists of two interlocked ribbed webs with crossed sinker wales, the ribs of each face of one web being disposed in the spaces between the ribs of the corresponding face of the other web. By providing different colored yarns for the needles of the respective sets vertical stripes and patterns can be produced. The fabric is uniform throughout and elastic, and is illustrated by various embodiments thereof, both in models and drawings. It is new, useful and ornate. It is used principally for underwear, and presents a soft, velvety surface to the skin, adding additional warmth without increasing materially the weight of the fabric. It has become increasingly popular with the knit goods trade and the public. The reason for this popularity is neither fanciful nor visionary. Unquestionably the patented fabric is more elastic than prior fabrics intended for winter wear, while equally smooth to the touch, both sides being alike in so far as the smooth, velvety feel is concerned. These advantages seem to be admitted. The defendant, Bernard T. Steber, was asked on cross-examination as follows:

"Q. The Scott interlock fabric is distinguishable in underwear from the ordinary ribbed underwear by 'feel,' is it not? A. There is a difference in the feel of, ordinary one-and-one ribbed underwear and that made on the Scott machine. The samples which I have felt of the Scott fabric appear to have a softer feel than ordinary ribbed fabric made of the same material."

The prior art does not show the Scott fabric, the nearest approach being the Howard and Tripp patents issued on the same date—May 31, 1881. The object of these inventors was to provide knitting machines having alternate sections thereof formed of two threads of different color, producing a fabric having a face side formed in vertical stripes composed of one or more stitches, and the back being formed of "overshot" work. Scott expressly disclaims the fabric of these patents, saying:

"My invention relates wholly to a ribbed web, and the advantages of my invention are attained only in connection with such a web."

He also disclaims the fabric of the Leighton patent of February 18, 1902, which does not show the essential features of the Scott invention. Nor is any machine of the prior art shown which is capable without material changes of producing the Scott fabric. But,

even though such a machine were shown, it would not anticipate a claim for a fabric or for the method of producing the fabric in the absence of proof that such a fabric had in fact been produced.

[2] A block of marble is, in a similar sense, capable of producing the Venus of Milo, but proof that such a block existed prior to the statue could hardly be said to anticipate that incomparable production. It seems unnecessary to spend time in support of the proposition that a method of making a new and useful fabric is not anticipated by testimony that prior to the invention of this fabric a machine was in existence which, by a few changes in adjustment, was capable of producing the fabric had some one known enough to make them. Few patents could survive such a test as this.

The defendants' exhibit, "Yellow and Black Striped Baby Blanket Goods," is, as we understand, intended to illustrate the product of a machine made and used by George A. Leighton in 1887 or 1888, 23 or 24 years ago. The exhibit may have been made on this machine. The product of the machine, whatever it was, certainly was not popular, and the machine soon went out of the business of manufacturing commercial fabrics, and was used for experimental purposes, necessitating a change of parts. Though in existence to-day, it is incapable of making the Baby Blanket material. We think there is too much uncertainty regarding the genesis of the Baby Blanket to warrant us in holding that its existence prior to Scott's invention is established beyond a reasonable doubt. Assuming, however, that it were so established, it does not anticipate, but, on the contrary, it furnishes an excellent illustration of what Scott added to the existing art. It shows very clearly the pronounced ribs with equally pronounced grooves between them, presenting rough feeling to the touch and the appearance of a harrowed field to the eye. When these ridges and valleys are filled up, we have the Scott fabric. It is the difference between a field marked by furrows and a close-clipped velvety lawn.

The defendants are not in a position to deny that the Scott patent discloses both novelty and invention in view of the fact that the defendant Steber, in March, 1910, received a patent for a knitted fabric which contains all the prominent features of the complainants' fabric, and differs only in details which do not alter its usefulness or its appearance. In other words, one who receives a patent for the Steber fabric in 1910 is hardly in a position to deny patentability to the Scott fabric of 1908.

The remaining question is one of infringement—does "Fabric A" infringe? The fabric is described in the Steber patent just alluded to, No. 951,033, and is illustrated by Figures 3 and 4. This patent was applied for June 18, 1909, nine months after the Scott patent had issued. Mr. Steber was shown the Scott fabric "about the winter of 1908 or 1909." The infringing fabric is described at length in the Steber patent and illustrated by the drawings. To present here a description without resort to models or drawings would serve no useful purpose if, indeed, it were possible to do so. If the same colored yarn be used throughout, the two fabrics are in front identical so far

as outward appearance is concerned. If different colored yarns be used it is made more apparent that the back of the defendants' fabric differs from the front, the back presenting a zigzag and the front a striped appearance. But it must be remembered that this is not a design patent and the appearance the fabric presents to the eye is not an element of the claims. In other words, a fabric made of white yarn which infringes cannot be made a noninfringing fabric by the introduction of a colored yarn.

We cannot avoid the conclusion that the defendants are attempting to appropriate the advantages of the Scott fabric and seek to avoid infringement by the introduction of an unimportant additional feature. The two fabrics are substantially alike in texture, weight, feel, elasticity and appearance. An expert might detect a difference but to the ordinary wearer they are the same. Perhaps the most concise statement of the distinction between the two, as pointed out in the Steber patent, is the difference between *interlocked* and *interknit* webs. Even if it be conceded that the interknit web is an improvement, it does not justify the appropriation of the fundamental advance by Scott. As we understand the alleged Steber improvement, it consists. in giving more permanent elasticity, a finer mesh and more body to the fabric between the ribs than in the Scott fabric; and these results, it is asserted, are obtained by the interknitting of the webs. We are not satisfied that the improvements above suggested are in fact produced. So far as can be judged from the various samples introduced, the two fabrics are practically alike. Of course we do not pretend to possess expert knowledge upon a subject so complicated and only speak after making such crude and general tests and examinations as laymen may make, with the assistance of the opposing views of the expert witnesses.

[3] The machine patent was granted June 15, 1909, upon an application filed September 21, 1908. The patentee says that his object is to provide a knitting machine which can produce a ribbed fabric having a closer disposition of the wales and a heavier or a firmer texture than fabrics produced in the usual way. Figure 5 of the drawings, showing an enlarged section of a piece of the fabric produced on the machine, is a reproduction of Figure 2 of the fabric patent. The claims in controversy are as follows:

"1. The combination in a knitting machine for producing a ribbed fabric, of two needle carriers each having two sets of needles, needle operating mechanism and a yarn supply co-operating with the needles of one set in each carrier to produce one ribbed fabric, and needle operating mechanism and a yarn supply co-operating with the needles of the other set in each carrier to produce another ribbed fabric interlocked with the first."

"4. The combination in a knitting machine for producing a ribbed fabric, of a cylinder and dial, each having two sets of needles, needle operating mechanism and a yarn supply co-operating with one set of needles of the cylinder and dial to produce one ribbed fabric and needle operating mechanism and a yarn supply co-operating with the other set of needles of the cylinder and dial to produce another ribbed fabric interlocked with the first."

The elements of the first claim are: In a knitting machine for producing a ribbed fabric:

First. Two needle carriers each having two sets of needles.

Second. Needle operating mechanism and a yarn supply co-operating with the needles of one set in each carrier to produce one ribbed fabric.

Third. Needle operating mechanism and similar yarn supply co-operating with the needles of the other set in each carrier to produce another ribbed fabric interlocked with the first.

The two claims are alike except that claim 4 is more specific, substituting "cylinder and dial" for "two needle carriers" of claim 1. We have, then, involved in this controversy, claims for a fabric, for the mode of producing the fabric and for a machine for knitting the fabric.

It is difficult to understand why a decree holding the claims of the machine patent valid and infringed is necessary for the complainants' protection. If the product and process claims of No. 899,439 are held to be valid and infringed, the defendants cannot make the fabric on any machine and, of course, cannot make it on the machine now used by them. Indeed, if the fabric could be knit by hand they could not produce it in that way either. No one can make the fabric of the Scott patent without infringing claims 2 and 4 of that patent.

If the manufacture of the fabric is enjoined in the future and the defendants account for profits and damages in the past, we do not see what additional remedy is needed, especially in view of the fact that the defendants' machine is susceptible of a perfectly innocent use. For instance, it can make Fabric B, concededly not an infringement, and, with slight alterations, other noninfringing fabrics. The claims both contain as elements two needle carriers, each having two sets of needles and a yarn supply co-operating with the needles of one set in each carrier to produce one ribbed web.

It is said that there is no such element or an equivalent therefor in the defendants' machine for the reason that they do not use two sets of needles, one in each carrier, to produce one ribbed web. Indeed, we understand the complainants' expert to admit that the defendants' machine is incapable of producing without alterations and omissions of some of its features of construction, a product comprising two distinct ribbed webs connected only by crossing sinker wales. This would seem to indicate that in his opinion the claim is not infringed by defendants' machine unless broadened in a manner not justified by the proof.

Moreover, we are not at all satisfied that the construction of the Scott machine required an exercise of the inventive faculties. It seemed to be taken for granted at the argument that if the fabric showed inventive genius the same conclusion must follow as to the machine. But we cannot assent to this proposition. A structure showing the highest type of invention may be made on the simplest machine and, on the other hand, the simplest product may be produced from a complicated machine showing the greatest ingenuity in its construction.

The Scott fabric shows a distinct advance in the art and very clearly presents points of superiority over prior ribbed knitted webs. But given the fabric and given the prior knitting machines, we see nothing

to convince us that the work of adapting these machines to knit the improved fabric was not that of the skilled workman. The complainants' expert says:

"The machines shown in these patents to Roscher, Bieger and Johnstone therefore contain or disclose constructions wherein needles in two beds, so arranged as to be capable of co-operating to knit rib fabric, may be operated in pretty much any possible relation to one another according to the character and collocation of the stitches desired to be produced in the fabric, and if one were given the fabric of the Scott fabric patent to be produced by such machine, the proper collocation or operative relation of the several needles in the two beds could probably be made to enable such machines to produce such fabric course by course in the continued operation of the machine."

Did Scott in adopting the old machines to knit the new fabric do anything which called into being "the intuitive faculty of the mind," known as invention? He had conceived the idea of a knit fabric having marked advantages over the old knit wear; he probably illustrated his invention by drawings, diagrams and models. With the old machine before him, showing the operation of the needles in similar environment, he had little to do but make them knit the pattern he desired. As Mr. Livermore says:

"The proper collocation or operative relation of the several needles in the two beds would probably be made to enable such machines to produce such fabric."

We must be satisfied that patentability and infringement have been established and if there be substantial doubt on these questions we should resolve it in favor of the defendants, and especially so in a case where the complainants can obtain all the relief to which they are entitled without a ruling sustaining propositions so doubtful.

The decree is affirmed as to claims 2 and 4 of the fabric patent and reversed as to claims 1 and 4 of the machine patent without costs in this court, and the cause is remanded to the Circuit Court with instructions to dismiss the bill as to the machine patent without costs to either party in that court.