## WESTINGHOUSE ELECTRIC & MFG. CO. et al. v. ROYAL–EASTERN ELECTRICAL SUPPLY CO. et al.

(District Court, E. D. New York. November 5, 1925.)

No. 1872.

**1. Patents ⬤══328—1,113,149, for wireless receiving system having feed-back to grid circuit, held infringed.**

Armstrong patent No. 1,113,149, claims 9, 15, and 16, October 6, 1914, for wireless receiving system with feed-back to grid circuit *held* infringed.

**2. Patents ⬤══174—Improvement patent of value construed liberally.**

Improvement patent of value should be liberally construed.

**3. Patents ⬤══167(1)—Not restricted to precise form shown in drawing.**

Patent should not be restricted to precise form shown in drawing.

In Equity. Patent infringement suit by the Westinghouse Electric & Manufacturing Company and another against the Royal-Eastern Electrical Supply Company and another. Decree for plaintiffs.

Charles Neave, L. F. H. Betts, and Stephen H. Philbin, all of New York City, for plaintiffs.

Cavanaugh & James, of New York City (Maxwell James, of New York City, of counsel), for defendants.

CAMPBELL, District Judge. This is a suit in equity brought by the plaintiffs against the defendants to restrain the alleged infringement of patent No. 1,113,149, issued by the United States Patent Office to Edwin H. Armstrong, for wireless receiving system, October 6, 1914. The plaintiff Westinghouse Electric & Manufacturing Company is the owner of the patent, and the plaintiff Radio Corporation of America is a licensee thereunder. The suit has been discontinued as to the defendant Royal-Eastern Electrical Supply Company.

The patent in suit was sustained as valid and of primary importance in Armstrong & Westinghouse Electric & Manufacturing Co. v. De Forest Radio Telephone & Telegraph Co., in the District Court of the Southern District of New York, 279 F. 445, which was affirmed by the Circuit Court of Appeals, Second Circuit, 280 F. 584.

The defendant Amsco Products, Inc., by answer denied the validity of the patent in suit as well as infringement.

[1] The claims of the patent relied upon in the suit at bar are Nos. 9, 15, and 16, which were among those adjudicated valid in the prior litigation, and read as follows:

"9. An audion wireless receiving system having a wing circuit interlinked with a resonant grid circuit upon which the receiving oscillations are impressed, and an inductance through which the current in the wing circuit flows, the grid circuit including connections for making effective upon that circuit the potential variations resulting from a change of current in the wing circuit."

"15. An audion wireless receiving system having a wing circuit interlinked with a resonant grid circuit upon which the received oscillations are impressed, and means supplementing the coupling of the audion to facilitate transfer of energy from the wing circuit to the grid circuit, whereby the effect upon the grid of high frequency pulsations in the wing circuit is increased.

"16. An audion wireless receiving system having a resonant wing circuit interlinked with a resonant grid circuit upon which the received oscillations are impressed, and means supplementing the coupling of the audion to facilitate transfer of energy from the wing circuit to the grid circuit, whereby the effect upon the grid of high frequency pulsations in the wing circuit is increased."

The defendant Amsco Products, Inc., make and sell radio receiving sets termed Melco-Supreme tuned radio frequency receivers, which are alleged in the bill of complaint in the action at bar to be infringements.

On the trial and in the brief submitted on behalf of the defendant, the validity of the patent in suit is admitted, but infringement thereof is strenuously denied.

The invention of the patent in suit and its object can best be described in the words of the patentee as found in the specifications: "The present invention relates to improvements in the arrangement and connections of electrical apparatus at the receiving station of a wireless system, and particular-

ly a system of this kind in which a so-called 'audion' is used as the Hertzian wave detector; the object being to amplify the effect of the received waves upon the current in the telephone or other receiving circuit, to increase the loudness and definition of the sounds in the telephone or other receiver, whereby more reliable communication may be established, or a greater distance of transmission becomes possible. To this end I have modified and improved upon the arrangement of the receiving circuits in a manner which will appear fully from the following description taken in connection with the accompanying drawings: As a preliminary, it is to be noted that my improved arrangement corresponds with the ordinary arrangement of circuits in connection with an audion detector to the extent that it comprises two interlinked circuits; a tuned receiving circuit in which the audion grid is included, and which will be hereinafter referred to as the 'tuned grid circuit,' and a circuit including a battery or other source of direct current and the 'wing' of the audion, and which will be hereinafter referred to as the 'wing circuit.' As is usual, the two circuits are interlinked by connecting the hot filament of the audion to the point of junction of the tuned grid circuit and the wing circuit. I depart, however, from the customary arrangement of these circuits in a manner which may, for convenience of description, be classified by analysis under three heads: Firstly, the provision of means, or the arrangement of the apparatus, to impart resonance to the wing circuit so that it is capable of sustaining oscillations corresponding to the oscillations in the tuned grid circuit; secondly, the provision of means supplementing the electrostatic coupling of the audion to facilitate the transfer of energy from the wing circuit to the grid circuit, thereby reinforcing the high frequency oscillations in the grid circuit; and, thirdly, the introduction into the wing circuit of an inductance through which the direct current of the wing circuit flows, and which is so related to the grid circuit that the maintaining electromotive force across the terminals of the inductance, due to reduction of the direct current, is effective in the tuned grid circuit to increase the grid charge, and consequently to further reduce the current in the wing circuit and in the telephones. By a further extension of this idea, the effect of the maintaining electromotive force upon the grid current may be augmented by the use of a transformer in a manner which will be understood from the following description."

The invention of Armstrong is based on his discovery that in the plate circuit of the audion there appeared, or could be made to appear, in substantial quantities, not only the audio frequency changes of the current which operated the telephone, but also radio frequency current of the extremely high frequencies of the waves and agreeing in frequency with the arriving waves and the frequency of the current in the grid circuit.

The Circuit Court of Appeals said: "The Armstrong invention consists in applying the variations in the current, which are of radio frequency, in such manner as to transfer energy back into the grid circuit. This was a wholly novel idea."

The Armstrong invention comprises the utilization of radio frequency energy in the plate circuit of the vacuum tube, to amplify the oscillation in the grid circuit of the tube by a feed-back action which is so arranged as to augment and sustain the oscillations in the input circuit.

The means proposed by Armstrong for accomplishing this feed-back, i. e., means supplementing the electrostatic coupling of the audion, with which we are concerned in the suit at bar, is referred to by him at line 51, page 1, of the patent, "to impart resonance to the wing circuit"; that is, to tune the wing circuit. There already was tuning in the grid circuit, but his proposal of tuning the wing circuit, in which every one before that had thought there was nothing but audio frequency current, was novel.

Feed-back by means of tuning the plate circuit appears in the arrangement of Fig. 1 (inductance $L'$) and condenser $C^3$, Fig. 2 (inductance $L'$), Fig. 3 (inductance $L'$), and Fig. 5 (inductance $L'$). In Fig. 3 it is the only means of accomplishing feed-back.

In Fig. 3 the natural frequency of the plate circuit is varied by means of the inductance $L'$, with the result that as radio frequency energy in the plate circuit is built up by reasonance, a negative charge in the grid will be accompanied by an increase in the potential of the plate, as pointed out in the specifications, page 2, line 90. This tuning of the plate circuit in the demonstrations made before me effected an increase in distinctness and loudness as the plate circuit was tuned to approach the oscillation point. This circuit may be used as a heterodyne receiver by increasing the feed-back to the point where the self-oscillations

are generated. This was also pointed out by the Circuit Court of Appeals as follows: "If the regenerative or feed-back coupling is sufficient to transfer enough energy from the plate circuit to the grid circuit, the energy released from the battery in the plate circuit will be greater than the entire loss of energy in the system of circuits, whereupon continuous independent electrical oscillations will persist in the system, irrespective of the oscillations which may be impressed thereon from the antenna and the audion in the regenerative feed-back circuit becomes an independent generator of continuous oscillations."

When the audion is oscillating, the currents so generated may heterodyne or beat, with the received oscillations. Thereby beat currents of audible frequency may be observed as whistles. These self-heterodyne whistles are characteristic of feed-back.

Fig. 3 of the patent in suit, which is the figure taken for comparison with the defendant's circuit, corresponds to the old, simple audion circuit except for this new feed-back effect that Armstrong secured in this arrangement by tuning the plate circuit by means of a variometer or inductance coil $L'$. When this inductance is utilized in the plate circuit, it causes the potential of the plate or wing $W$ to vary by reason of the radio frequency fluctuations in the plate circuit.

In a three-element audion tube, that is, one containing three electrodes, a filament $F$, a grid $G$, and a wing or plate $W$, there exists inherently an electrostatic capacity between any two of the electrodes, and notably between the grid and the plate. This inherent capacity was known to exist prior to the Armstrong invention, but he first discovered that the grid and plate could be utilized as a condenser, so that radio energy could be fed back from the plate circuit to the grid circuit through the tube when the plate circuit was tuned. The "electrostatic coupling" of the audion, as that term is used in the patent in suit, page 1, line 58, is the capacity between the plate and grid of the tube. In Fig. 3 of the patent in suit the means supplementing the electrostatic coupling of the audion to give the feed-back effect are the coil $L'$ and possibly the condenser in shunt with the telephone receivers.

Prior to Armstrong's invention, January 31, 1913, there had been no disclosure in any publication including patents of a tuned plate circuit in a three-electrode audion, but he disclosed and clearly described

the use of a tuned plate circuit for accomplishing feed-back, as was stated by the Circuit Court of Appeals in the prior decision: "He tuned the plate circuit to radio frequency by inserting in the plate circuit such inductance and capacity as to make it responsive to the radio frequency waves. Then he found, not only that the radio frequency waves could be carried over into the plate circuit, but that they could be there amplified by the energy derived from the local battery in the plate circuit without change of frequency wave form and that they could be fed into the grid circuit, where they increased the potential variations on the grid and the operation continuously repeated itself, producing the feed-back regeneration which increased, normally the sensitiveness of the device and the loudness of the receiving signals."

Fig. 3 of the patent in suit employs only the tuned plate circuit, and the conception that by tuning the plate circuit the internal coupling of the tube may be utilized for feed-back was entirely new with Armstrong.

The patent in suit is not broadly for radio amplification. The claims cover radio frequency amplification by controlled and useful feed-back.

The Melco-Supreme receivers com-

plained of as infringements of the Armstrong patent may be briefly described by reference to Amsco's Chart 5, Defendant's Exhibit V, Plaintiffs' Exhibit 14.

SCHEMATIC DIAGRAM OF MELCO RECEIVER
(OMITTING AUDIO FREQUENCY AMPLIFIER SYSTEM)

In the Melco-Supreme receiver a plurality of circuits are arranged in series or cascades employing four or five audion tubes, the first two tubes being employed as radio frequency amplifier tubes, that is, for amplification of the high or radio frequency energy, the third tube being employed for detection or rectification, and the fourth and also the fifth tube, if there be one, being utilized for amplifying the audio frequency energy; the antenna being connected to the first radio stage, and the telephone or loud speaker being connected to the last audio stage. The third or detector audion tube is not employed for rectification and amplification, as in the Armstrong circuit.

There is no contention on the part of the plaintiffs that there is any infringement in the detector stage or in the audio frequency stages, but they do contend that the feed-back invention is utilized in the two radio frequency stages.

No complaint is made by the plaintiffs of any casual, incidental, and uncontrollable feed-back or transfer of radio frequency energy that there may be in the Melco set, from various parts of the circuits to other parts of the circuits, as they agree that so far as practicable such reactions are minimized.

The plaintiffs do complain of, as an infringement, what they allege is the controlled and useful feed-back through the tube, from the plate circuit to the grid circuit of each of the first two tubes, the radio frequency stages, in the Melco receivers.

The circuits in defendant's receivers, reference being had to Plaintiffs' Exhibits 13 and 14, are generally as follows:

The antenna to ground circuit passing through a series condenser and the variometer marked T-1. This variometer or variable inductance coil, which in the set is controlled by the knob T-1, has across its terminals a small fixed condenser and is connected to the grid and filament of the tube No. 1. The output circuit extends from the plate of the tube through the primary coil P and the B battery back to the filament. The three coils CF, P and S above the designation T-2 are all contained in the variotransformer which is controlled by a dial on the front of the set which is marked T-2. The coil P directly in series with the plate and B battery is inductively coupled to the coil S which in this vario-transformer is a multiple variometer coil whose inductance and whose coupling to the coil P may be varied simultaneously by turning the con-

trolling dial of *T–2*. Across the secondary coil of this vario-transformer *T–2* is connected a small condenser as indicated and the grid and filament of the second tube which is marked No. 2. The coil marked *CF* in this first vario-transformer is placed in inductive relation to the two other coils. The compensating condenser *C–1* has its movable plate connected to the grid. The second tube has its tuned grid circuit including the coil *S* of the vario-transformer *T–2*.

The output circuit of tube No. 2 extends from its plate through coil *P* of the vario-transformer marked *T–3* and back to the filament through the plate battery. This second vario-transformer has a counter feed-back coil connected through the variable compensating condenser *C–2*, just as in the case of the first tube and the vario-transformer *T–2*. The vario-transformer *T–3* also has across its secondary coil a condenser which is also across the grid and filament connections of the third tube. In the grid connection of this third tube there is a small fixed condenser and grid leak which is characteristic of such tube as a rectifier. The plate circuit of the third tube extends to the audio amplifier or directly to the telephone when it is desired to listen to the signals as reported there.

The invention in the patent in suit is illustrated by an audion system in which there is detection, as well as the new contribution of Armstrong, namely, radio frequency amplification by feed-back.

In the Melco-Supreme receiver the third or detector audion tube is not employed for rectification and amplification, as in the Armstrong circuit.

The defendant contends that the Armstrong disclosure is wholly to the use and operation of an audion as a detector in its conjoint function of detection and amplification, the amplification being obtained by a feed-back action. In other words, the defendant contends that the claims should be interpreted as though they read "an audion wireless receiving system functioning as a detector and having" certain elements.

The patentee in describing the invention of the patent in suit says: "The present invention relates to improvements in the arrangement and connections of electrical apparatus at the receiving station of a wireless system, and particularly a system of this kind in which a so-called 'audion' is used as the Hertzian wave detector. * * *" and again: "As a preliminary,

9 F.(2d)—26

it is to be noted that my improved arrangement corresponds with the ordinary arrangement of circuits in connection with an audion detector to the extent that it comprises two interlinked circuits; a tuned receiving circuit in which the audion grid is included, and which will be hereinafter referred to as the 'tuned grid circuit,' and a circuit including a battery or other source of direct current and the 'wing' of the audion, and which will be hereinafter referred to as the 'wing circuit.'"

The audion referred to in the patent in suit is the three-electrode vacuum tube device invented by De Forest, and shown in his patent No. 879,532, of February 18, 1908. The drawings of the patent in suit show but one audion and do not show a separate detector. There is however, no mention made of a detector in the claims in suit Nos. 9, 15, and 16, which cover "an audion wireless receiving system having" certain elements. Therefore it appears that the only theory on which defendant contends for its interpretation is because the description of the invention in the patent is illustrated by an audion system in which there is detection, as well as the new contribution of Armstrong, namely, radio frequency amplification by feed-back.

[2] The patent in suit is for a valuable invention and should be liberally construed. Eibel Co. v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Tompkins-Hawley-Fuller Co. v. Holden (C. C. A.) 273 F. 424, 430.

The function of detection was old. An audion system containing radio frequency amplification by feed-back, claimed in the patent in suit, is entirely new. There is nothing in the prior art (and defendant cites De Forest patents Nos. 841,387 and 879,532, French, Von Lieben, 13,726, and United States patent 1,038,910) which requires a limitation to combined radio frequency amplification and detection. Lyon Non-Skid Co. v. Edward V. Hartford, Inc. (D. C.) 247 F. 524, affirmed 250 F. 1021, 162 C. C. A. 664.

In the simple audion arrangement of the prior art, as illustrated by the De Forest patent No. 879,532, the audion system had a tuned grid circuit, detected or rectified, and there was an increase in the audio frequency components of the modulated currents, due to the relay action of the tube. The audio arrangement of Armstrong contains these functions, and Armstrong's contribution was a wholly new function for

radio apparatus, namely, radio frequency amplification, due in part to the relay action of the tube and due in part to feed-back.

The patentee properly claims in the claims in suit apparatus adapted to perform the function of feed-back amplification of radio frequency energy. The specification does not limit the claims, nor must the claims have the detector limitation written in them, because Armstrong did not describe a use of the invention in a receiving system in which a crystal detector was used, or in a transmitting system where there is no detection.

[3] A patent should not be restricted to the precise form shown in the drawing. Harvey Hubbell, Inc. v. General Electric Co. (C. C. A.) 267 F. 564, 570; Consolidated Bunging App. Co. v. Metropolitan Brewing Co., 60 F. 93, 8 C. C. A. 485.

Notwithstanding the fact that the claims of the patent in suit all commence with the words "an audion wireless receiving system," the Circuit Court of Appeals decided in the De Forest suit, supra, that the Armstrong patent in suit is not limited to feedback in a receiving system, but also covered feed-back in an oscillating audion or transmitter, and held as follows: "The inventor is entitled to the benefit of all uses to which his invention can be put, no matter whether he conceives the idea of the use or not."

It is therefore clear to me that Armstrong's invention covers the regeneration or feed-back audion and this invention is not limited to an audion functioning as a detector. Therefore, Matheson v. Campbell, 78 F. 910, 24 C. C. A. 384, cited by defendant, is not in point.

Each of the two radio frequency tube systems in the Melco sets is an audion receiving system, and the patent covers the use of the feed-back circuit in such systems.

In my opinion the claims should not be interpreted as though the words "functioning as a detector" were added to them.

The defendant contends that by the patentee's filing of an affidavit, under Patent Office Rule 75, and failure to file under Patent Office Rule 94, the plaintiffs are now estopped from claiming that the patent in suit is broad enough to cover an audion as an amplifier anterior to detection, as shown in the Schloemilch & Von Bronk patent.

The history of the patent in suit in its progress through the Patent Office, without unnecessary detail, is as follows:

The application was filed October 29, 1913, with fourteen claims. Claims 9 and 13 were rejected by the Patent Office on the British patent of Schloemilch & Von Bronk, Thompson, 8,821, of 1913, which had an acceptance date of October 2, 1913. On an application filed March 14, 1913, there had issued, February 17, 1914, the Schloemilch & Von Bronk United States patent, No. 1,087,892. Without any discussion of the disclosures of the reference, Armstrong canceled claim 13, added some claims, and carried his invention back of the Schloemilch & Von Bronk references. The claims were then allowed.

I do not see the force of defendant's reasoning that because the patentee did not file an affidavit under rule 94, the plaintiffs cannot lay claim to the use of an audion as a radio frequency amplifier, separate from and anterior to detection, because it clearly appears from the testimony of all the expert witnesses that Schloemilch & Von Bronk taught nothing of feed-back, whereas, the patent in suit taught the employment of regenerative feed-back.

If an affidavit had been filed under rule 94, an interference would have been proper, but there was no reason therefor, as the applications of the respective patentees did not show or claim the same invention, and therefore I do not see that Lewis Blind-Stitch Machine Co. v. Arbetter F. Machine Co. (D. C.) 208 F. 992, affirmed 219 F. 557, 135 C. C. A. 325, so freely quoted by the defendant, is an authority in the case at bar.

Plaintiffs cannot complain if the circuits of the Schloemilch & Von Bronk patent be so constructed as not to utilize feed-back, but plaintiffs have a right to complain if the circuits of the Schloemilch & Von Bronk patent be so constructed as to utilize what Schloemilch & Van Bronk knew nothing of, namely, feed-back.

There is no proof that there was ever any adjudication of the Schloemilch & Von Bronk patent, and therefore it would hardly seem to be entitled to be described, as it is by defendant, as a basic patent. But be that as it may, undoubtedly the circuits shown in that disclosure can be so constructed as to produce feed-back. But that does not make the invention of the patent the same as the invention of the patent in suit. General Knit Fabric Co. v. Steber Machine Co., 194 F. 99, 114 C. C. A. 177.

The defendant has offered in evidence a number of patents, but its expert discussed but few of them, and inasmuch as

the defendant does not now deny the validity of the patent in suit, presumably they were offered solely to show the prior state of the art.

The Schloemilch & Von Bronk United States, German, and British patents: The Schloemilch & Von Bronk United States patent was a copending application with and therefore not prior art to the patent in suit. The effective date of the British patent was its date of sealing, and the effective date of the German patent was the date of its publication, both of which are later than the date of invention of the patent in suit.

The date of invention of the patent in suit was January 31, 1913; therefore the Schloemilch & Von Bronk references are too late.

The De Forest patents, Nos. 841,386, 995,126, 1,507,016, and 1,507,017: None of these patents were explained by defendant's expert. No. 841,386 shows no grid as in the audion of the modern art or as shown in the patent in suit, and No. 995,-126 shows a three-electrode audion, but Armstrong's invention is not disclosed or even suggested in either patent. The other two patents are too late.

The Lindridge Article in the Telephone Engineer of September, 1912: This was introduced in evidence in the De Forest suit and deals with the well-known singing in telephone systems. There was nothing in it to suggest the invention of the patent in suit.

The Von Lieben et al. patents, which are earlier than Armstrong, relate to audio amplifying systems. They disclose two stages of audio frequency amplification. The tubes employed were mercury vapor tubes which were exceedingly critical in their operation, and were therefore provided with a potentiometer (control of grid voltage with respect to the filament). None of the Von Lieben references teach or even suggest that radio frequency energy may be fed back from the plate circuit to the grid circuit.

In the apparatus constructed according to the circuit diagram of the Von Lieben French patent, Amsco Chart 6, by the defendant, and demonstrated by it, there was no tuning shown, and tuning would be an utterly undesirable thing in an audio frequency amplifier.

The defendant demonstrated by a test that, by increasing the amplifying power of the tubes, this system could be made to oscillate at some random undetermined and uncontrollable frequency, and that when modern nongaseous tubes were used, these oscillations could be made to cease by adjusting the potentiometer so as to decrease the amplifying power of the tubes. Oscillations of that sort have been present in the amplifying telephone system for many years and recognized as an obstacle to the use of the telephone amplifiers. No control of the frequency of the oscillations is disclosed in these patents.

Fessenden patents, Nos. 706,738 and 742,779, Stone patents, Nos. 714,831 and 864,272, and Ehret patent, No. 734,048: These patents disclose a plurality of tuned circuits connected by radio frequency transformers, and also disclose the use of condensers, which was old prior to Armstrong.

The Sindig-Larsen Norwegian patent, No. 18,491, was not explained.

The defendant called as a witness Mr. Sleeper, the editor of a publication devoted to radio engineering news, and who was in close touch with radio matters, to show that there was a recognized distinction between the Armstrong circuit and tuned radio frequency circuit, and while he testified that the tuned radio frequency receiver is a nonregenerative circuit, I do not think much weight can be attached to that testimony, as showing that the Melco-Supreme receiver does not infringe the claims of the patent in suit, because his classification of radio receivers was regenerative, nonregenerative, and superheterodyne sets, notwithstanding the fact that it has been decided that superheterodyne sets utilize regeneration and infringe the Armstrong patent. Westinghouse Co. et al. v. Morris Taub (D. C.) 4 F.(2d) 605.

In any event, the question of infringement is not to be determined by evidence of recognized distinction, as that may be largely one of name, but by evidence showing the structure, function, mode of operation, and results. It is to be noted, however, although he testified on direct-examination that tuned radio frequency receivers do not oscillate, on cross-examination he testified that he supposed you might so tune a radio frequency receiver to oscillate so that you could pick up distant stations by the beat note, and that there would be regeneration in the tuned radio frequency receiver which generated oscillations in the radio frequency system.

Prior to Armstrong, that is, prior to January 31, 1913, there was no tuned plate circuit. In the old use of the simple audion

there existed within the same tube the function of rectification or the Fleming effect, and in addition a slight increase in sensitiveness, the improvement to a double sensitiveness, which may be assigned to audio frequency amplification. All of this was well known to Armstrong and pointed out by him in the Electrical World article. Armstrong added to the simple audion circuit the new invention that has been called the feed-back circuit or regenerative circuit. Armstrong's invention is based on his discovery that in the plate circuit of the audion there appeared, or could be made to appear, in substantial quantities, not only the audio frequency changes of the current which operated the telephone, but also radio frequency currents of the extremely high frequencies in waves and agreeing in frequency, of course, with the frequency of the arriving waves and the frequency of the current in the grid circuit. All this was entirely new, and the claims of the patent in suit are not limited by the prior art.

The patent in suit made a great advance in the art and is entitled to the benefit of the doctrine of equivalents commensurate with the advance made by the inventor. Paper Bag Patent Case, 210 U. S. 415, 28 S. Ct. 748, 52 L. Ed. 1122.

The defendant contends that the Melco-Supreme circuit is a tuned radio frequency amplifier circuit of the type shown in Fig. 3 of the United States patent to Schloemilch & Von Bronk, No. 1,087,892, with means added for eliminating the feed-back inherent in audion amplifier tubes.

There is no teaching or disclosure of feed-back in the Schloemilch & Von Bronk patent from which the defendant claims its structure is derived, but that the circuit arrangement of Fig. 3 of the Schloemilch & Von Bronk patent, with the knowledge now possessed by a competent engineer, might be so constructed as to utilize the feed-back invention of Armstrong, to me seems to have been clearly demonstrated.

As shown in Fig. 3 of that patent, the plate circuit of the first radio frequency tube contains the primary coil of the transformer k. The secondary coil of this transformer has across it a variable condenser n. The input circuit of the crystal detector l (corresponding to the grid circuit of an audion) is tuned by means of the condenser n. This condenser is not stated in any of the Schloemilch & Von Bronk patents, issued either by the United States or any foreign country, to be necessary, but in the United States patent the following statement is found: "An intermediate circuit n syntonized to the oscillations will preferably be provided." For the condenser n to tune the plate circuit of the first tube, the primary and secondary coils of the transformer k must be closely coupled, but no suggestion is found in the patent that this coupling must be close. The condenser n can be made effective to tune the plate circuit of the first tube so as to cause feed-back through the tube, but there is no suggestion in any of the patents that there was any feed-back, and it is hard to believe that the patentees would not have pointed out the beneficial feature of feed-back if they had known of it.

It does not seem to me, however, that the test is what a man with knowledge now current in the art could do, by simply following the mere circuit diagram of the Schloemilch & Von Bronk patent, but what the patent disclosed to those learned in the art at the time it was issued, without the knowledge which has since come to them by the disclosure of the invention of the patent in suit. The defendant cannot justify its use of feed-back by the Schloemilch & Von Bronk patent, which taught nothing of feed-back, simply because feed-back may be added to a Schloemilch & Von Bronk circuit by following the teachings of the patent in suit. Van Heusen Products v. Earl & Wilson (D. C.) 300 F. 922, 930, affirmed on consent; Eibel Co. v. Paper Co., supra; Hillard v. Fisher Book Typewriter Co., 159 F. 439, 86 C. C. A. 469.

The defendant's contention that there was feed-back in the Schloemilch & Von Bronk circuit, which was inherent and of a generic type and detrimental instead of being beneficial, may be accepted as true to a certain extent, but there is no complaint by the plaintiffs in the action at bar based on that character of feed-back in the defendant's set; in fact, they admit that such feed-back has been substantially eliminated in the defendant's structure. In any event there could be no complaint by the plaintiffs, merely because there was uncontrolled feed-back of the generic type in the defendant's set, which was not regenerative because Armstrong did not first discover that feed-back of the generic type existed nor that the same might be eliminated; but what Armstrong did discover was that additional amplification might be obtained by transferring radio frequency energy back from the plate circuit to the grid circuit, to supplement the current set up in the grid circuit by the intercepted radio wave, and he was the first to provide means for accomplishing this feed-back.

This controlled and useful feed-back through the tube from the plate circuit to the grid circuit of each of the first two tubes, the radio frequency stages, is what plaintiffs complain of in the Melco receivers.

The defendant contends that the feed-back found in the Melco-Supreme set is not the regenerative feed-back of the patent in suit, but a feed-back of the generic type which has become recognized as being very detrimental to proper functioning of the audion as an amplifier, and that in order to make the Melco-Supreme circuit work, you must eliminate the feed-back existing therein. With this contention I cannot agree, because the plaintiffs' and defendant's tests convinced me that feed-back was not eliminated but controlled in the Melco-Supreme set, and also that the Melco-Supreme set not only could work wthout eliminating feed-back, but worked best when it approached closely to the point of oscillation.

The defendant, in its publication entitled "Radio Frequency Amplification," Plaintiffs' Exhibit 16, evidences the presence of controlled feed-back in its receivers, for at pages 22 and 23 it states: "The compensating condenser for the last stage may be varied to allow some feed-back so as to give sharper tuning characteristics to each stage of the set." And at page 27 it publishes the following letter: "The variable neutralizing condensers I find most helpful in increasing the sensitivity and the selectivity of the receiver, for it is possible to approach very closely to the point of oscillation."

I am convinced that the Melco-Supreme receivers are capable of utilizing feed-back to obtain amplification of radio frequency energy, and that the same exists, because in the construction of the circuit the defendant has followed the teaching of the patent in suit and tuned the plate circuit. In Fig. 3 of the patent in suit the plate circuit was tuned by means of a variometer or inductance L. In the Melco receivers the plate circuit of each of the two radio frequency tubes is tuned by the variable inductance $S$ in the vario-transformer $T$-$2$ or $T$-$3$. The regenerative controls of the Melco receivers are the two vario-transformers controlled by the dials $T$-$2$ and $T$-$3$, the compensators $C$-$1$ and $C$-$2$ and the three filament rheostats. Dials $T$-$2$ and $T$-$3$ control two vario-transformers which by tuning of the plate circuits associated with various transformers control regeneration from absence to a point that produces an overwhelmingly strong oscillation. The compensating condensers $C$-$1$ and $C$-$2$ control the amount of radio frequency energy fed back by the counter feed-back path around each of the radio frequency tubes.

The rheostat connected to the filaments of the two radio frequency tubes controls feed-back. This is apparent when you consider that the amplifying power of the tube can be controlled by means of the filament rheostat, and that the more amplification there is with a given capacity the greater the reaction, and that the more radio frequency there is in the plate circuit, the more radio frequency energy there is available to feed back to the grid circuit. In both the radio frequency tube circuits of the defendant's set regeneration appears and is used and can be controlled by tuning the plate circuit through the dials $T$-$2$ and $T$-$3$, and by variation of the filament heating of the radio frequency tubes, and the amount of feed-back may also be controlled by the variation of the compensating condensers, the variations of the compensating condensers permitting adequate control of the amount of feed-back to throw the receiver into a relatively unsensitive condition or to give it a very sensitive response adjustment or beyond that to produce oscillation.

The defendant has not followed the teaching of the Von Lieben patents to which it has made reference, because those patents did not teach the tuning of the plate circuit, nor the control of oscillation; they simply taught the control of grid voltage with respect to the filament. In fact, the defendant would not have been compelled to concern itself so greatly with the subject of control if it had not tuned the plate circuit. When the feed-back through the tube is reduced to a minimum by the compensators, they are said to be at their "balance point." When the compensators are so adjusted that the tube is oscillating or self-heterodyning, the characteristic heterodyne whistles may be heard.

I cannot agree with the defendants that the heterodyne whistle in the Melco-Supreme receiver is due to generic feed-back, because the tests show that in that receiver there is a full range of controlled and useful feed-back. Self-heterodyne whistles are characteristic of regenerative receivers. The heterodyne effect is useful in picking up a radio signal from a distant station, and while it may not be a necessary use of the Melco receiver, the employment of feed-back to generate oscillations shows that feed-back can be utilized to the maximum through the oscillation point. For broadcast reception the most beneficial use of feed-back is

below the oscillation point. This it appears to me was recognized by the defendant (Plaintiffs' Exhibit No. 15) in paragraph 8 of the instructions issued by it, which reads as follows: "In the initial reception of stations over 100 miles distant, it may be of advantage to upset the adjustment of dial C-2 by rotating it clockwise to permit a local oscillation to start. This facilitates picking up the carrier wave of the distant station. This may be recognized as a clear whistle whose pitch may be rapidly changed by slight movements of T-2 and T-3. After dials T-1, T-2 and T-3 have been adjusted to make the whistle as loud as possible, turn C-2 slowly back until the whistle disappears and the true tone of the station is heard." This paragraph fully describes how the feed-back can be utilized to the maximum, that is, through the oscillation point, and how to obtain the most beneficial use that is just below the oscillation point.

Defendant claims that in the Melco-Supreme circuit the eliminating devices cut out the feed-back when a balance point is obtained, to the point of practical elimination, and even though a residual amount of feed-back be present which cannot be eliminated, there can be no infringement, and cites Hewitt v. American Telephone & Telegraph Co. (D. C.) 272 F. 194, affirmed (C. C. A.) 272 F. 392.

This case does not seem to be in point, because I have found, not only that radio frequency energy may be fed back from the plate circuit to the grid circuit, in the Melco receiver, but that such feed-back is controlled by the means hereinbefore indicated, and that the Melco receiver, not only could work without eliminating feed-back, but works best when it approaches closely to the point of oscillation, whereas in the case cited the Hewitt invention was not utilized in the amplifier audions of the telephone company.

Defendant has claimed all during the trial and in its briefs that feed-back, while useful in the regenerative detector, is useless in amplifiers; but in my opinion it has not shown any reason why the function of radio frequency amplification is in any way different in an audion system, which is not employed for detection, and I can see none.

The Melco receivers, as I have found, are capable of utilizing feed-back by reason of tuned plate circuits, and I have also found that they contain means for controlling the amount of feed-back in each radio frequency tube. But even if it be assumed that the compensating condensers can be so varied as to balance completely the feed-

back through the tube, that will not avoid infringement. Corrugated Fiber Co. v. Paper Working Machines Co., 259 F. 283, 288; Sandusky Foundry & Machine Co. v. De Lavaud (C. C. A.) 274 F. 607, 610; Parsons Non-Skid Co. v. Atlas Chain Co., 198 F. 399, 117 C. C. A. 286.

Claim 9 of the patent in suit is infringed by the defendant's receiver, in which each of the two radio frequency audion systems has a wing circuit interlinked with a resonant grid circuit, "an inductance through which the current in the wing circuit flows," inductance coil P, and "connections for making effective," etc., which include the grid and the capacity interlinkage with the plate circuit.

Claims 15 and 16 of the patent in suit are likewise infringed by the defendant's receiver. The said claims differ only in that claim 15 does not call for a "resonant" wing circuit and claim 16 does, and both read on the defendant's receiver, in which each of the two radio frequency audion systems has a resonant wing circuit interlinked with a resonant grid circuit and "means supplementing the coupling of the audion," which means is the tuned plate circuit, the natural frequency of which is controlled by the inductance coil S.

A decree may be entered in favor of the plaintiffs against the defendant as prayed for in the complaint.

Settle decree on notice.