## JONES v. FREED–EISEMANN RADIO CORPORATION.

### No. 3674.

District Court, E. D. New York.

Sept. 7, 1929.

Decree affirmed in 47 F.(2d) 174.

Cavanagh & James, of New York City (Maxwell James, of New York City, of counsel), for plaintiff.

Pennie, Davis, Marvin & Edmonds, of New York City (Willis H. Taylor, Jr., of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is an action in equity for the alleged infringement of patent No. 1,658,804, issued to the plaintiff for Capacitive-Coupling Control System, dated February 14, 1928; and patent No. 1,658,805, issued to plaintiff for Capacitive-Coupling Control System, dated February 14, 1928.

The original application was filed December 15, 1922.

The alleged divisional application of patent No. 1,658,804 was filed September 21, 1926.

The alleged divisional application of patent No. 1,658,805 was filed March 15, 1927.

The said alleged divisional applications for the patents in suit were not filed as a result of a requirement for division by the Patent Office, but were optional divisions.

The defendant, Freed-Eisemann Radio Corporation, is the manufacturer of Freed-Eisemann Neutrodyne radio receivers, and has been continuously since December 5, 1922, utilizing the Hazeltine Neutrodyne patents under which it has been licensed.

The instant suit is being defended by and at the expense of the Hazeltine Corporation, the owner of said Hazeltine Neutrodyne patents.

The two Jones patents in suit relate to the neutralization of capacity-coupling, in whole or in part, of vacuum tubes employed in the circuits of a radio receiver.

The first of the patents in suit was not issued on the first alleged divisional application, but on the second, as the first alleged divisional application was filed December 13, 1923, and resulted in patent No. 1,641,438, the specification of which is substantially identical with the original Jones application, filed December 15, 1922.

The first patent in suit, No. 1,658,804, was not filed until September 21, 1926, about three years and nine months after the filing date of the parent application, and about three years and seven months after the Freed-Eisemann Neutrodyne appeared on the market; but during the interval between March 16, 1923, and September 21, 1926, plaintiff filed twenty-one patent applications, one of which, filed March 6, 1926, now patent No. 1,620,261, relates to an alternative to the method of the parent application, filed December 15, 1922.

The second patent in suit, No. 1,658,805, was not filed until March 15, 1927, about four years and three months after the filing date of the parent application, and about four years after the advent of the Freed-Eisemann Neutrodyne on the market; but during the interval between September 21, 1926, and March 15, 1927, plaintiff filed seven patent applications.

The structure of the transformer coils P, A, and S, and the coupling and circuit connections of Defendant's Exhibit W, as originally built and operated as early as December 7, 1922, is substantially identical with the circuit arrangements of the Freed-Eisemann alleged infringing receiver, Plaintiff's Exhibit 8, and there was no change in the design of the sets after the Jones Melco Supreme radio receivers came on the market.

Any suggestion which the plaintiff intended to convey that such a change was made was without any knowledge to support it, because if his testimony, with regard to his knowledge of the defendant's receiver, be accepted as true, we must believe that although there was delivered to him, by the defendant, during July 1923, a Freed-Eisemann N R 5 Neutrodyne receiver for the express purpose of inspection, and that he was familiar with various neutrodyne receivers on the market during the period 1923 to 1926, he never examined any of the coupling transformers

of such neutrodyne receivers until about April, 1928. Therefore, of course, he could not tell if any such change had been made.

All during this period the Hazeltine licensed manufacturers were making and selling neutrodynes, having arrangements which are described by the claims of the patents in suit, as now interpreted by plaintiff.

The claims in suit are of a different character and scope than those presented in the plaintiff's original case of December 15, 1922, and the parent application did not suggest that Jones regarded the features now alleged to be covered by the claims in suit of importance, or that he meant to claim such features, because it was not until the amendments of October 29, 1927, and December 29, 1927, that we find the plaintiff giving importance to couplings less than unity, substantially less than unity, separately and closely, equally, and that range of couplings that can be obtained with air cored transformers, although such features might have been described and claimed in the first divisional application of December 13, 1923, now patent No. 1,641,438, and it was not until the trial that there appears to have been any contention raised as to the importance of the so-called reflected feed-back phenomenon.

The original application of Jones, filed December 15, 1922, was involved in an interference in the Patent Office with the "plate circuit neutralization" patent of Hazeltine, No. 1,533,858, owned by the Hazeltine Corporation.

The Patent Office tribunals unanimously awarded priority of this important invention to Hazeltine, and accorded to him the benefit of his filing date of December 28, 1920.

Patent No. 1,533,858, to Hazeltine, was originally filed December 28, 1920, and issued on April 14, 1925, on a divisional application filed in response to a requirement of the Patent Office on December 28, 1923.

The parent patent No. 1,489,228 was issued on April 1, 1924, at which time the drawing and specification, which were identical with those of patent No. 1,533,858, became available to the public.

The plaintiff is not corroborated by Priess, the only person to whom it is contended that he disclosed the work he said he did in 1917; in fact, Priess testified that plaintiff made no such disclosure, and that as late as 1919, the usual form of neutralizing arrangements was not known to him, Priess.

The invention of plate circuit neutralization by Hazeltine was considered of sufficient importance by the Navy Department to keep a complete file with reference thereto, and yet not even one of the superior officers of Jones, the plaintiff, has appeared to testify that Jones made any report to him of work done by Jones along these lines in 1917, much less that Jones made any disclosure to him, and there is nothing found in any files of Jones' work along these lines in 1917.

Freed, the president of the defendant, showed Jones, the plaintiff, a sketch of Hazeltine's plate circuit neutralization arrangement, as embodied in a receiver, on December 10, 1922 (Exhibit A).

The plaintiff says the sketch (Exhibit A) is incomplete, but he also says that Freed told him, on December 10, 1922, that he (Freed) had seen a model apparatus embodying the Hazeltine circuit, that such apparatus did not operate satisfactorily at first, and that Freed, by moving a connection, succeeded in securing better results. There can, therefore, be no question that Freed, prior to December 10, 1922, had constructed a model apparatus embodying the Hazeltine circuit, which operated, and had shown a sketch to the plaintiff before plaintiff filed his application for the parent patent.

This was five days prior to the plaintiff's filing date of his parent application of December 15, 1922.

The fact of the execution of the license agreement on December 18, 1922, between plaintiff and defendant, which was subsequently returned to the plaintiff, does not warrant the reflections cast upon the testimony of Freed in plaintiff's brief, as that very agreement shows that the possibility of conflict with Hazeltine was considered.

The position taken by the plaintiff in the past does not seem to be consistent with his present position, especially the insistence of plaintiff's counsel that Jones solved the problem of a workable tuned radio-frequency receiver, in the patents in suit.

In his testimony in the action entitled Westinghouse Electric & Manufacturing Company and Radio Corporation of America v. Royal-Eastern Supply Company and Amsco Products, Inc. (D. C.) 9 F.(2d) 397, tried and decided in 1925, before the amendments of October 29, 1927, and December 29, 1927, were made to the applications for the patents in suit, the plaintiff accorded to Hazeltine the title of "the inventor of the Neutrodyne type of receiver"; but on the trial of the instant suit qualified that tribute, on the ground that at that time he did not know all the facts he knew now, and that he had

found out a great deal after that suit; and he also said that by using the term "Neutrodyne type of receiver" he was referring to the general type of capacitively-tuned amplifier circuit, as distinguished from the inductively-tuned type.

In the same case Jones testified, on cross-examination, that he was not the first to have an "inductively-tuned circuit coupled together in a radio-frequency amplifier system," nor the first "to have them in cascade arrangement," nor the first "to have means for controlling or eliminating feed-back in a radio-frequency system."

Jones also testified in the same case: "In the inductively-tuned system, my contribution was the invention and design of units which would effectively tune and amplify and with regard to the feed-back devices, the feed-back elimination devices, they were devices which would really eliminate the feed-back"; and that he "was the first to design and put on the market a tuned radio-frequency set of the Melco Supreme type."

In the same case, it seems to me that Jones testified to the same fact as Hazeltine did in the instant suit, with regard to Fig. 3 of the patent No. 1,087,892 to Schloemilch and Van Bronk, when Hazeltine said, and I agree with him: "This figure shows a stage of tuned radio-frequency amplification, and the arrangement of the circuit is such that the addition of the neutralizing means would put it in essentially the same form as the Neutrodyne receiver."

Hazeltine, in the instant suit, also testified, with reference to Fig. 2 of patent No. 1,173,079, to Alexanderson, as I believe correctly:

"This figure in the Alexanderson patent to which you have referred is even more closely arranged in the way that the Neutrodyne receivers are arranged, with the exception of the absence of neutralizing means. It is multistage and the coupling system includes a transformer with a tuning condenser connected across the secondary, just as is the practice in all the Neutrodynes."

Judge Thacher, in deciding the case entitled Radio Corporation of America v. E. J. Edmond & Co. (D. C.) 20 F.(2d) 929, 931, in discussing the Alexanderson patent No. 1,172,079, after speaking of self-oscillations produced by feed-back from the plate circuit to the grid circuit of each audion said:

"Modern methods for the control of regeneration and the undesirable self-oscillations which result therefrom were unknown in the art when the patent in suit issued. These improved methods have perfected Alexanderson's system of geometric tuning."

As I understand the plaintiff's contention, broadly stated, it is that the first patent in suit centers about the coupling relations between the coils, primary, auxiliary, and secondary designated throughout the trial as P, A, and S, in electron discharge tube circuits, and the second patent about tuning.

In view, however, of Schloemilch and Van Bronk patent, No. 1,087,892, and Alexanderson patent No. 1,173,079, tuning was old either in single stage or in multistage arrangement, as shown in those patents, and this opinion is strengthened by the testimony of Jones, in the Amsco Case, and Hazeltine and Wheeler, in the instant suit, and also because all neutrodyne receivers employed the arrangement of the Alexanderson patent, Fig. 2, plus plate circuit neutralization. Therefore, there was no invention in tuning, as broadly claimed by the plaintiff in the second patent in suit.

As I have hereinbefore stated, the plaintiff is not corroborated as to any work he says he did in 1917, relating to the invention here in suit, or to neutralization of capacity-coupling in general, by whatever name it is called, and therefore no further consideration will be given thereto.

This brings us to the development work the plaintiff says he did in 1922.

He is not corroborated by Priess, whom he called as a witness, as Priess said he had no recollection of receiving a letter which plaintiff says he sent to him, dated October 24, 1922, and containing a paragraph relating to some work done by plaintiff, entitled "Tube Capacity Coupling," which plaintiff says is work he did in October, 1922.

Plaintiff says he visited Priess in October, 1922, in connection with some litigation in which Priess was involved, and that before going to Boston he visited the witness Danziger at his house.

The witness Danziger says that at that time the plaintiff thought of a circuit for neutralizing the capacity of the vacuum tube, and drew for Danziger such a circuit.

Danziger drew a circuit in testifying here (Exhibit 40) to show the circuit Jones had at that time drawn for him, which shows a capacitively-tuned neutralized stage.

Danziger, when testifying in the Hazeltine interference, drew a circuit (Exhibit C C) to show the same circuit hereinbefore referred to, that Jones on the occasion of the

aforesaid visit had drawn for him, which showed an inductively-tuned arrangement.

The explanation made by the witness Danziger of this inconsistency, "I might have recalled it is possible to use either the inductively-tuned or the capacitively-tuned," is not impressive.

The witness Danziger testified in this suit that the arrangement of Exhibit 40 (Danziger Sketch 1) is the one the plaintiff tried out immediately after his return from Boston.

In the interference, the witness Danziger testified that the arrangement the plaintiff set up immediately after his return from Boston was an inductively-tuned arrangement (Exhibit CC, Danziger Sketch 2).

On being asked on the trial of the instant suit whether he wanted to change his answers to the questions, the answer of Danziger was, "Why, the experiment I was mostly interested in was the matter of tube neutralization, and as far as my testimony is concerned, I think that is the only part of it that I care to testify to exactly," which does not impress me as being the kind of corroboration required.

The witness Danziger also said that both types of tuning were tried out, "exactly which one was tried before the other I could not say"; and he also said that he did not know how much prior to March, 1923, it was that the plaintiff set up either an experimental or other arrangement employing capacitive-tuning.

The testimony of the witness Danziger with reference to reflexing and Exhibit 20 shows that his recollection is not sufficiently certain and accurate to furnish corroboration of the plaintiff's testimony.

None of the notebook entries, either in bound book or on loose pages, of the plaintiff, referred to on the trial in connection with Exhibit 17, were ever signed, initialed, or dated by any individual but the plaintiff himself, with the exception of page 18 of plaintiff's bound notebook, which under date of December 9, 1922, contains a calibration, in the handwriting of the witness Danziger, and under date of December 13th, contains an entry in the handwriting of the witness Danziger, and initialed by him.

Plaintiff testified it was not his practice at that time to have his laboratory notes witnessed by anybody.

The plaintiff testified that he entered into an agreement with the Mortimer Radio Corporation, under date of October 26, 1922, the agreement being in the form of a letter from Mr. Price to Mr. Jones, dated that day, in which, among other things, it is provided that the plaintiff was to design, for the Mortimer Radio Corporation, a three-tube receiving set, wherein "the back coupling due to tube capacity" was to be removed.

Plaintiff says he thereupon immediately proceeded to start to work on the design of such a set, and on that day made an entry in his loose-leaf notes (Exhibit 17), page 1, of the circuit arrangement to be used.

The plaintiff said the circuit shown on page 1 of the loose-leaf notes, dated October 26th, indicated an inductively-tuned arrangement for the first radio-frequency amplifier tube, and a capacitively-tuned arrangement for the second radio-frequency amplifier tube, and a capacitively-tuned circuit for the input of the detector tube, and that the circuit represented a wiring diagram of an actual set-up of apparatus that he had made on October 23, 1922, and with which he had been experimenting between October 23 and October 26, 1922.

The witness Danziger could not identify the said arrangement of page 1, nor say whether it was capacitively-tuned or inductively-tuned, but did say: "There is no tuning element shown there. * * * It does not show any tuning." And he later said that the circuit shown on page 1 is not a circuit of any particular set-up, but a circuit of something that was being planned.

This certainly could not be called corroboration.

The letter dated November 2, 1922, which was sent by the plaintiff by registered mail to Mr. Danziger, and deposited thereafter unopened in the plaintiff's safe deposit box, is relied on by plaintiff to fix the date of disclosure of the capacity eliminator. The envelope was opened at the time of the plaintiff's testimony in the Hazeltine interference.

The letter in question was accompanied by a second sheet inclosed therewith, and dated the same day, which stated the purpose of sending the disclosure with the letter was "to assist in establishing the fact that today is the actual date of the disclosure of the capacity eliminator."

If November 2d was the date of disclosure, then it confirms Priess' testimony that he had no recollection of receiving the letter alleged to have been sent to him by plaintiff, dated October 22d, and it also shows that plaintiff could have made no disclosure in his discussion with Price, on October 26, 1922, of an arrangement for "removing the back coupling due to tube capacity."

The paper dated November 2, 1922, entitled "Disclosure of Invention," shows three figures substantially the same as Figs. 1 to 3 of the patents in suit, and contains the statement:

"The plate battery tap on the plate impedance is preferably at the exact center and the two halves of the plate impedance are preferably strongly coupled together and equally coupled to the secondary, so as to ensure having equal and opposite potentials on the points A and P with respect to the plate battery tap D."

In other words, the plaintiff prescribed that the inductance of the primary coil P, and the inductance of the auxiliary or neutralizing coil A, shall be equal and alike in number of turns, etc., and that the two halves of the coils P and A shall be preferably strongly coupled together, and equally coupled to the secondary S.

A "coupling substantially less than unity" is not even suggested, but a strong or very close coupling of the coils P and A is recommended. On the trial the plaintiff attempted to reduce the force and effect of his words "preferably strongly," but finally, after considerable questioning, in answer to a question as to "What range of coefficient of coupling you mean between coils P, and A, when you say 'closely coupled,' and also when you say 'preferably strongly coupled,'" he said, "I would say I would mean generally about the same thing."

There is no suggestion in the disclosure that "the main feed-back coupling does not originate in the primary * * * but originates in the tuned secondary circuit and is reflected from this circuit into the plate or primary coil," but that disclosure states:

"Fig. 1 shows the invention applied to a tube with an inductively coupled transformer in the plate circuit,

"Fig. 2 shows it applied to a tube with a choke coil in the plate circuit."

Nothing is reflected back from the choke coil shown in Fig. 2.

Although Jones' counsel now urges that Hazeltine's failure in 1922, as he terms it, was due to his failure to recognize this reflected feed-back phenomenon, we find that in neither the original application of Jones, filed December 15, 1922, nor in the Jones patent here in suit, is there any mention of this phenomenon. Therefore, it seems to me that Hazeltine succeeded and did not fail, even if he did not recognize the phenomenon of reflected feed-back, which seems to be an afterthought of the plaintiff, Jones.

Plaintiff also claims, as I believe without any foundation, that Freed constructed his model FF after Jones disclosed to Freed the invention of his patent in suit.

Exhibit W embodies a reflex arrangement, but Freed did not secure from Jones the idea of eliminating reflexing in constructing defendant's Exhibit FF, which did not utilize reflex, and was made up immediately following the construction of Exhibit W, and prior to the visit of Jones on December 10, 1922. This is shown not only by the testimony of Freed, but by the entry on page 18 of the plaintiff's notebook, under date of December 11, 1922:

"At Oradell found definitely that reflexing spoils quality of loud signals and decided to eliminate it."

From which it appears that Jones did not eliminate reflex until after Exhibit FF was made up, and Jones had conferred with Freed.

Exhibit 20 does not embody a reflex arrangement, and plaintiff alleges he delivered it to the Mortimer Radio Corporation on December 22, 1922.

We will now turn to the work of Hazeltine:

As I have hereinbefore stated, the Navy Department's file of correspondence and disclosure to it by Hazeltine during the year 1919 is complete.

No mention of coupling substantially equal to unity is found in the disclosure accompanying Hazeltine's letter of May 10, 1919.

Hazeltine forwarded to the Navy Department, under date of July 14, 1919, a draft specification which was almost in the same form as the specification of the application filed December 28, 1920, claim 4 of the draft application being substantially claim 1 of Hazeltine patent, No. 1,533,858, and relates broadly to plate circuit neutralization.

Claims 11 and 12 of the draft application relate to multistage arrangements.

Claim 11 relates to plate circuit neutralization, and claim 12 to grid circuit neutralization, both in a multistage amplifier.

Claim 1 of Hazeltine patent, No. 1,450,080, specifies close coupling only, and not a coupling substantially equal to unity.

Hazeltine's patent, No. 1,450,080, was filed by the Navy Department on August 6, 1919, and his applications for patents Nos. 1,489,228 and 1,533,858 were filed by his attorneys, the former on December 28, 1920, and the latter being a division of the former,

required by the Patent Office, on December 28, 1923.

The corroboration of Hazeltine's testimony as to his work, prior to the filing of his application on December 28, 1920, is complete and convincing.

The next work of development by Hazeltine of which we are informed began on July 31, 1922, when, as shown in his notebook, he first began to outline and design a suitable arrangement for a tuned radio-frequency amplifier receiver, employing more than one vacuum tube.

He first worked with a receiver employing super-regeneration, but about the end of August was engaged in designing a simple regenerative receiver, which did not employ super-regeneration.

Plaintiff's receiver, Exhibit 20, may be characterized as a simple regenerative receiver. It has regenerative control in the form of adjustable condensers, which may be adjusted for balance, in which case it is not regenerative, or they can be adjusted to give regeneration.

The performance of that type of receiver is much better when regeneration is employed.

It is unnecessary to detail each of the steps taken by Hazeltine, as they are recorded in his notebook, the important steps being dated and witnessed by men who identified their initials on the trial.

On August 29, 1922, occurred the visit of Harold A. Wheeler to Hazeltine, at his laboratory at Stevens Institute of Technology, Hoboken, N. J., when Wheeler sketched the circuit now pasted in Hazeltine's notebook, on page 398, and initialed and dated by Hazeltine, at which time Hazeltine showed Wheeler the drawings of his application filed December 28, 1920, now patents Nos. 1,489,228 and 1,533,858, and Wheeler agreed that his method was the same as that of Fig. 2 of the said Hazeltine patents.

At the same meeting Hazeltine showed Wheeler a radio-frequency amplifier, which is the receiver of Hazeltine patent No. 1,658,-638.

It appears from Hazeltine's notebook and the testimony that Hazeltine had been continuously working on a form of tuned neutralized radio-frequency amplification, up to and including August 30, 1922.

A circuit diagram appears in Hazeltine's notebook, under date of September 6, 1922, checked, signed, and dated by Dreyer and Poole, which relates to a receiver which had been tried out and gave excellent results.

The following entry by Hazeltine, dated September 8, 1922, appears right below the one last mentioned:

"In the above circuits it was found that the neutralizing coil A could be adjusted so that it neutralized capacity coupling just as with the model arrangement as described on page 398."

On page 414, under date of November 3, 1922, appears a diagram drawn by Hazeltine, of a neutralized tuned radio-frequency amplifier, having plate circuit neutralization, and being multistage. This arrangement was disclosed to Wheeler on the same day, and he signed his name thereto.

On page 429, under date of December 3, 1922, there is an entry relating to the proper angle at which to place coils for the purpose of avoiding magnetic coupling therebetween, which was utilized in Exhibit W, and has been covered by Hazeltine's patent No. 1,577,421.

Rodman had difficulties with an untuned radio-frequency amplifier, caused by oscillations, and consulted Hazeltine. He says that Hazeltine told him, in June or July, that he (Hazeltine) had invented a method or circuit which would solve Rodman's problem, but that his attorneys did not think it should be disclosed at that time.

Rodman kept after Hazeltine pretty consistently.

In the latter part of November, 1922, Hazeltine, at his attorneys' office, drew a sketch of his invention for Rodman, who was president, and Freed, who was secretary, of the I. R. M., an association of manufacturing companies.

Rodman had an appointment to meet Hazeltine at Freed's office, on December 5, 1922, but missed him. He saw Freed, however, who showed him the sketch Exhibit V, which Freed says Hazeltine left with him on that day, and which Rodman says incorporates the schematic diagram and general layout of parts which was to be employed in the first model receiver.

Freed built the receiver in accordance with Exhibit V, and Hazeltine, Rodman, Freed, and Dreyer identify Exhibit W as the receiver which was built by Freed.

The receiver was completed and Hazeltine, Freed, Rodman, and the others, received signals on it on the evening of December 7, 1922, but were not able to properly control

oscillations. Rodman was very well satisfied with the results that had been obtained.

Hazeltine took Exhibit W to his laboratory and certain changes were made, the unsatisfactory semicircular plate neutralizing condensers were removed and replaced by twisted pieces of wire, and on December 8 or 9, 1922, Hazeltine satisfactorily operated the receiver, in the presence of Freed, Rodman, and others, and it neutralized so that no difficulty was encountered with oscillations.

Hazeltine modified the circuit arrangement in Exhibit W from the way it had been constructed by Freed, following Hazeltine's sketch Exhibit V, so that the tap-off connection, which made use of a portion of the secondary coil as the neutralizing coil, was changed from the tap-off or intermediate point to the end of the secondary coil, utilizing the twisted wire as neutralizing condenser.

This tap-off arrangement is fully disclosed in Hazeltine's patent, No. 1,577,421, granted March 16, 1926.

This is the tap-off connection used in the alleged infringing device, and is exactly the same as that shown on Exhibit V, except that in the alleged infringing device the primary winding extends a little beyond the tap portion of the secondary.

Hazeltine says that the original tap-off connection of Exhibit W employed couplings between the primary and auxiliary and secondary, respectively, of 75–80 per cent. and 70–75 per cent.

Exhibit W as originally constructed by Freed employed the same circuit connections as those employed in the alleged infringing device, and a schematic circuit arrangement of the tuned radio-frequency amplifier portion of the alleged infringing apparatus is shown in Fig. 2 of Hazeltine's application, filed April 7, 1924, now patent No. 1,577,421, granted March 10, 1926.

I see no reason for any discussion of the slight change made at Christmastime, or the demonstration in March, as the invention was complete long before that time. Neither do I see any need for a discussion of the newspaper articles referred to in the evidence, and emphasized by plaintiff, except to call attention to the fact that plaintiff never made any oral or written complaint of the article in the New York Tribune of Sunday, March 4, 1923, which characterized the Hazeltine receiver as the one which revolutionized the radio-frequency amplifier.

As has been shown, the work of Jones lacks corroboration except for the disclosure of November 2, 1922, and his receiver was not completed and delivered to the Mortimer Radio Corporation until December 22, 1922.

As has been hereinbefore stated, Jones in his disclosure of November 2, 1922, prescribes that the inductance of the primary coil P, and the inductance of the auxiliary or neutralizing coil A, shall be equal and alike in number of turns, etc., and also prescribes that the two halves of the coils P and A shall be preferably strongly coupled together and equally coupled to the secondary S; but this was not new, because equality of coupling between P, and S and A, and S is shown in the Hazeltine patents, Nos. 1,450,080, 1,489,228, and 1,533,-858, when the coils $L_1$ and $L_2$ are equal and very closely coupled, and this was pointed out in Hazeltine's disclosure of May, 1919, and the specification of his patent filed in August, 1919.

This suit is based on claims 1, 2, and 4 to 11 of the first Jones patent, No. 1,658,804.

Claim 4, which plaintiff contends is typical of the single stage claim embodying plate circuit neutralization, reads as follows:

"4. In combination, an electron discharge tube with its grid and plate electrodes, a grid or input circuit, a plate or output circuit, a transformer having primary and secondary coils the primary coil of which is in said output circuit, and means for compensating for energy retransfer from the plate to the grid circuits including a condenser connected to the high potential side of the grid circuit and a coil connecting said primary coil with said condenser and coupled to said primary coil with a coupling substantially less than unity, the said coil and the said primary coil being separately and equally coupled to the transformer secondary coil, the said coil and the condenser having values such that the product of the created potential and the capacity of the condenser is substantially equal to the electrostatic charge carried to the grid from the plate across the grid plate capacity."

Claim 11, which plaintiff contends is typical of the multistage claim embodying either plate or grid circuit neutralization, reads as follows:

"11. A neutralized multistage amplifier comprising a plurality of stages, each stage having an electron discharge device containing a grid and a plate circuit and mechanism in each stage for neutralizing the capacity coupling between the grid and plate circuits of such stage due to the capacity between the grid and plate electrodes, said neutralizing mechanism for each stage comprising a coil

connected between one of the electrodes and the filament system and an auxiliary coil and a neutralizing capacity connected in series between the other of these electrodes and the filament system, said auxiliary coil being coupled electromagnetically with a coupling substantially less than unity to the first coil, and both said first coil and auxiliary coil of each stage being coupled separately and closely to a coil of the next adjacent stage."

In each of the claims of this patent it is specified that the primary coil and the auxiliary coil are coupled together, with a coupling substantially less than unity. The coupling of the auxiliary coil to the secondary coil, and the primary coil to the secondary coil, being shown in the claims of the patent in suit as follows:

Claim 1, as separately and closely.

Claim 2, as closely and equally.

Claim 4, as separately and equally.

Claim 5, as separately and equally.

Claim 6, as separately and closely.

Claim 7, as separately and equally.

Claim 8, as separately, closely, and equally.

Claim 9, as separately and closely.

Claim 10, as closely and equally.

Claim 11, as separately and closely.

As I have before stated, there was no suggestion by Jones of a coupling less than unity, or substantially less than unity, until the amendments made in 1927, which were made to distinguish over Hazeltine patent, No. 1,533,858, which was cited as a reference.

The claims of the original application, with the exception of claim 4, which related to a specific arrangement of a neutralizing condenser, as shown in Fig. 5, disclosed nothing over Hazeltine and were all rejected by the Patent Office Examiner, on Hazeltine patent No. 1,533,858, the rejected claims all being directed to plate circuit neutralization, either in conjunction with tuning, or in conjunction with the various permutations and combinations utilizing separate, equal and close couplings; that is, each claim recited two of these three limitations in combination, and permutations were made of the different possible combinations, and some of the claims described both tuning and this relationship of equal, close, and separate coupling.

Claims 5, 12, 13, and 14 were amended to describe couplings less than unity, but these were again rejected by the Patent Office Examiner, on Hazeltine patent, No. 1,533,858, stating:

"While it is true that the Hazeltine disclosure deals with very close coupling, it is also true that unity coupling is impossible to attain, and the expression 'less than unity' does not distinguish over the above mentioned patent."

The remaining claims, which theretofore had been limited to a coupling "substantially less than unity," were allowed.

Claims 5, 12, 13, and 14 were then amended to read, "a coupling substantially less than unity."

If there is any difference in the mind of the plaintiff between the meaning of the words "less than unity," and "substantially less than unity," he certainly did not explain it in terms of percentage range, under questioning which was long sustained and even participated in by the court.

The nearest approach to the real meaning of the words to him appears in the following answer of the plaintiff:

"I do not think you can ever reduce it to a percentage. Where two coils are purposely pulled apart so as to make the coupling depart a great deal from unity coupling, then I would say that is substantially less than unity."

In making the amendment above described to the specifications and claims, Jones pointed out that he meant by a "coupling substantially less than unity," that range of coupling that can be obtained with air cored transformers, and then said, "As understood, this does not mean that applicant is limited to all air cored transformers."

Hazeltine patents, Nos. 1,489,228 and 1,533,858, show air cored transformers in Figs. 5 and 6.

In Hazeltine Corporation v. Electric Service Corporation (D. C.) 18 F.(2d) 662, Judge Thacher discussed the matter of coupling at some length. Hazeltine patent No. 1,489,228 claims broadly an arrangement wherein the coupling between the primary (P) coil and the neutralizing (A) coil is specified as "substantially equal to unity." Hazeltine patent, No. 1,450,080, specifies particularly in the claim there in suit that the coils P and A are "closely coupled." The apparatus alleged to infringe the Hazeltine patents in that case had a coefficient of coupling of 72 per cent. between the P coil and the A coil, and Judge Thacher held this degree of coupling to be close and within the scope of Hazeltine patent, No. 1,450,080, but that it

was not a coupling which could be characterized as "substantially equal to unity."

Jones says that Judge Thacher's ruling is in accord with his viewpoint of "close coupling" and "coupling substantially less than unity."

The alleged infringing device in the instant suit employs a coupling of 70 per cent.

In Hazeltine Corporation v. A. H. Grebe & Co., Inc. (D. C.) 21 F.(2d) 643, the coupling was of the order of 80 per cent. (actually 77 per cent.).

In Hazeltine Corporation v. E. A. Wildermuth, 34 F.(2d) 635, 638, recently decided by the Circuit Court of Appeals of the Second Circuit, a suit based on Hazeltine patent, No. 1,533,858, which was originally filed December 20, 1920, and issued April 14, 1925, on a divisional application filed in response to a requirement of the Patent Office on December 28, 1923, the respective disclosures of Hartley, Hazeltine, and Rice are fully discussed, and the court says with reference to close coupling:

"The claims relied upon are in no way limited by close coupling. It is contended that the only distinction between Hazeltine and Rice is the closeness of coupling; that Hazeltine's patent cannot be expanded by ignoring the express limitations of close coupling, which it is said is the essential feature to the Hazeltine method. In narrowing his claims [while in interference with Rice and] in distinguishing his invention from Rice, who had a grid circuit neutralization, Hazeltine did consent to close coupling in so far as the grid circuit neutralization claims were concerned, but broadly he secured a patent for the plate circuit neutralization over and above Rice, who is the nearest in the prior art."

And after referring to the original and divisional applications aforesaid, further said:

"The claim that the only distinction between Hazeltine and Rice is the closeness of the coupling, and that the patent here in suit was expressly limited to close coupling, and cannot be expanded beyond it, is without force in the light of the history of these applications and the patents resulting therefrom. When Hazeltine's applications were originally filed, he was uninformed about the Rice invention; he had broad claims for the use of electro neutralization, and to avoid Rice's grid circuit he consented to the close coupling improvement over Rice."

And again, in speaking of Hazeltine patent, No. 1,533,858, said:

"The subject-matter of the claims of the patent in suit is plate circuit neutralization. This is claimed broadly, without limitation to the degree of coupling in the claims herein relied upon. Close coupling is usable with plate circuit neutralization, as well as with grid circuit neutralization, and according to Hazeltine it is the preferred form of neutralization. The plate circuit neutralization, as defined in claims 1, 2, and 5, is not disclosed in the Rice patent, and therefore belongs broadly to Hazeltine. And the particular preferred embodiment of plate circuit neutralization with close coupling is defined in claim 3. It is not relied on here. Therefore close coupling is not the only difference between Rice and Hazeltine, for, as we have said, Rice did not disclose plate circuit neutralization."

Hazeltine's research prior to July 14, 1919, resulted in his invention of plate circuit neutralization.

This is conclusively shown by the evidence in the instant suit, and nothing was offered in the instant suit to support any claim the plaintiff might make to be the inventor of plate circuit neutralization, other than his own uncorroborated testimony as to his work in 1917.

The alleged infringing device in the instant suit employs plate circuit neutralization and not grid circuit neutralization, and therefore if the limitation in all of the claims of the first patent in suit, "coupling substantially less than unity," has any definite meaning as to the degree of the closeness of coupling, it cannot, in so far as the alleged infringing device is concerned, distinguish over the Hazeltine patents hereinbefore referred to, and the work of Hazeltine and Wheeler in July and August, 1922.

Equality of coupling was shown by Hazeltine in his disclosure of May, 1919, and in the specification of August, 1919, because if the coils $L_1$ and $L_2$ are very closely coupled, they must, as the plaintiff says, be equally coupled to the secondary.

In the alleged infringing device of the instant suit, however, the coils P and A are not equal, and the neutralizing capacity is not equal to the tube capacity to be neutralized. That there may be substantially equal coupling coefficients in the alleged infringing device has no engineering significance.

As to separate coupling, I accept the testimony of Hazeltine that it does not apply to the alleged infringing device, but relates to an arrangement such as is shown in Exhibit EE. If I accepted Jones' interpretation as

applied to the alleged infringing device, then I would be obliged to hold that Hazeltine patents, Nos. 1,450,080, 1,489,228, and 1,533,858, disclose separate couplings of P to S, and A to S.

With regard to close coupling between the P and S coils, and the A and S coils, it is shown in all of Hazeltine's work and various patents since May, 1919.

From a careful reading of the original application of the plaintiff, filed December 15, 1922, of which the patents in suit are claimed to be divisions, I am convinced that the terms "coupling less than unity" and "coupling substantially less than unity" are afterthoughts, not supported by the original application, but inserted by amendment in an attempt to distinguish from Hazeltine's application.

■ As I have hereinbefore shown, the alleged infringing device had been on the market for over five years before the amendments in question were made, and this fact was well known to the plaintiff; and the plaintiff by such amendments, even if they had a meaning which would cause them to read on the alleged infringing device (which I do not believe), cannot interfere with the intervening rights acquired by the defendant. Chicago & N. W. R. Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053; Eagleton Mfg. Co. v. West Bradley & Casey Mfg. Co., 111 U. S. 490, 4 S. Ct. 593, 28 L. Ed. 493; Westinghouse Electric & Manufacturing Co. v. Jeffrey-De Witt Insulator Co. (C. C. A.) 22 F.(2d) 277; Dwight & Lloyd Sintering Co. v. Greenawalt (C. C. A.) 27 F.(2d) 823; National Electric S. Co. v. Telefunken Wireless T. Co. (D. C.) 209 F. 856; Marconi Wireless Tel. Co. v. National Electric Sig. Co. (D. C.) 213 F. 815.

■ The first patent in suit, No. 1,658,804, is invalid; but even if I am in error in this opinion, I am convinced and find that the defendant does not infringe that patent as to any claims in suit.

This suit is also based on all the claims of the second Jones patent, No. 1,658,805.

While both the plaintiff and his counsel said that the line of division between the first and second patents in suit is tuning, the fact is that plaintiff actually secured broader claims in conjunction with tuning, in the second patent in suit, than were allowed in the first patent in suit.

Claims 1, 7, 8, 9, 14, and 16 contain the limitation of "a coupling less than unity."

Claims 2, 3, 4, 5, 6, 10, 11, and 12 contain the limitation of "a coupling substantially less than unity."

Claim 13 provides: "The said coil and auxiliary coil being coupled to said air cored inductance coil to produce opposite reaction charges on said plate electrode and said neutralizing capacity."

The coil first referred to as "said coil" being the primary coil.

Claim 15 provides: "The said coil and auxiliary coil being coupled together closely and being coupled to said air cored inductance coil to produce opposite reaction charges on said one of the electrodes and said neutralizing capacity."

Again, the coil first referred to as "said coil" is the primary coil.

What has been said about couplings in the discussion of the first patent in suit applies with even greater force here, because some of the claims are broader; but aside from that, Jones was not the first, as between Hazeltine and himself, to have either a single stage or multistage tuned neutralized amplifier arrangement, in the light of Figs. 5 and 6 of the Hazeltine patent, No. 1,533,858, and in the light of the work of Wheeler in July, 1922, and Hazeltine during August and September, 1922.

Plaintiff's brief comments on Wheeler's work in July, 1922, and gives but two reasons why it is contended that such work fails to anticipate the patents in suit, and as neither of them relates to tuning, it is evidently conceded that Wheeler used tuning.

In view of what I have heretofore said, it appears to me to be of no moment whether in Wheeler the coupling between the primary and auxiliary coils P and A, as the plaintiff says, were not substantially less than unity, in any case; but in view of the testimony of the plaintiff in the instant suit, I cannot see how it can be said that the couplings of these coils were not close to the coil S, or the secondary circuit as a whole.

While reliance on the Wheeler testimony is not necessary in the instant suit, in the face of the other evidence, I can find no evidence warranting the contention of plaintiff that Wheeler abandoned his work; nor does it seem to me that more could be required of Wheeler, to make a complete disclosure of any invention he had made, than what he did in taking it up with his friend and adviser, Mr. Stewart, and in making the complete disclosure which he did to Hazeltine, including the diagram or sketch in Hazeltine's notebook.

Both of the claims 13 and 15 read directly on Fig. 6 of Hazeltine patent No. 1,533,858, and on Hazeltine's work done during August and September, 1922, and Wheeler's work in July, 1922.

Accepting the contention of plaintiff and his counsel that the line of division between the two patents in suit is tuning, then the second patent in suit, No. 1,658,805, is invalid for lack of invention over the first patent in suit, No. 1,658,804, and also because it is anticipated by Hazeltine patent, No. 1,533,858, which in Fig. 6 shows a tuned neutralized radio-frequency amplifier arrangement, which he states:

"The alternative arrangement of Fig. 2 may be applied to the neutralization of the capacity coupling in a radio-frequency power amplifier as illustrated in Fig. 6."

And also because, as I have hereinbefore held, it did not involve invention to apply "plate circuit neutralization" to the tuned radio-frequency amplifier arrangement, either in single or multistage, as shown in Schloemilch and Van Bronk patent, No. 1,-087,892, and Alexanderson patent, No. 1,173,-079.

The second Jones patent in suit, No. 1,-658,805, is invalid.

A decree may be entered in favor of the defendant against the plaintiff, dismissing the complaint with costs.

Decree affirmed in 47 F.(2d) 174.